WILLIAM K. ANDERSON v. JAMES C. DAVIS, Director General of Railroads, Appellant.

Division One, May 24, 1926.

1. **NEGLIGENCE: Penal Statute: Action against Director General.**
Notwithstanding the statute (Sec. 4217, R. S. 1919) is penal in its nature, an action may be maintained to recover the penalty against the Director General of Railroads for death caused by the negli-

gence of his employees while the railroad was being operated under Federal control.

2. **NEGLIGENCE: Humanitarian Rule: Peril: Slowing Down of Car: Unseen by Defendant: Recovery on Strength of Defendant's Testimony.** Assuming that plaintiff's testimony is true to the effect that he had been driving his automobile along the public road at a speed of fifteen to twenty miles per hour until he was within two hundred feet of the railroad; that he then began to reduce the speed, and when fifty feet from the right-of-way he was traveling only four or five miles per hour, and when twenty-five feet from the crossing he was traveling only three miles an hour, and that he could then have stopped the automobile almost instantaneously; and assuming that if the engineer and fire man of the train coming out of the hills had seen these things they might reasonably have believed that he was conscious of the peril in attempting to cross the track, yet those facts do not bar his right to recover under the humanitarian rule where the trainmen testified that they saw the automobile when it was from one hundred to one hundred and fifty feet from the track, that it was then traveling at a speed of twenty miles per hour, that it did not slow up as it approached the crossing, that its speed was not changed after it was first seen by them, and that there was nothing to indicate that it would stop before it reached the track, and the other testimony was to the effect that plaintiff was oblivious of the peril, that the view was obscured, that he looked and did not see the train, that the whistle was not sounded or the bell rung, that the train was running twenty-five miles an hour and could have been slowed down to one-half of that speed within one hundred feet of the crossing, and that it struck the automobile above its hind wheel, and would not have struck it at all had the train's speed been slackened. It was the duty of the trainmen to use due care to avoid striking the plaintiff, and their acts and conduct, by their own testimony, were not affected in the slightest degree by what plaintiff said were his acts as he approached the crossing, nor did they rely upon those acts, and the case is not one in which plaintiff relies upon the testimony of defendant, contradictory of his own, as establishing his right to recover. [Repudiating majority opinion in Anderson.v. Davis, 251 S. W. 86.]

3. ———: ———: **Pleading: Obliviousness.** The perilous situation of plaintiff and defendant's knowledge thereof are the ultimate and issuable facts to be pleaded under the humanitarian rule; obliviousness is but a subsidiary or evidentiary fact.

4. ———: ———: **Contributory Negligence: Matter of Law: General Demurrer: Waiver.** If the evidence tends to sustain any one of the several grounds of negligence pleaded, a general de-

murrer should be overruled.  Where the petition was grounded both on primary negligence and the humanitarian rule, and evidence was offered on both issues, and defendant's general demurrer to the evidence was overruled, and defendant thereupon asked instructions by which it submitted the matter of plaintiff's contributory negligence as a question of fact, and also asked separate instructions upon the theory of negligence under the humanitarian rule, defendant is in no position to insist on appeal that the evidence shows that plaintiff was guilty of contributory negligence as a matter of law and that the case should not therefore have been submitted to the jury upon the issue of the primary negligence of defendant in failing to give the statutory warning by whistle or bell before reaching the public road crossing, but having made no such request defendant waived its right to have the question of contributory negligence considered as a matter of law.

5. ————: **Evidence: Conditions After Accident.**  The place where the occupants of the automobile were thrown, the side of the track on which they were thrown, their distance from the track, their physical condition, immediately after the collision with the railroad train, are all evidentiary facts, and at the worst their admission is harmless.

6. ————: ————: **Custom.**  Testimony relating to the distance from a railroad crossing drivers of automobiles are ordinarily accustomed to slacken their speed is not admissible.  Besides, what a witness has to say about a custom does not establish the fact that there was a custom.

7. ————: **Instruction: Converse: Obliviousness.**  Plaintiff's given instruction having specifically required the jury to find that plaintiff and his wife were oblivious to the danger of crossing the railroad track, it was not error to refuse a converse instruction asked by defendant; and especially so, where another instruction given for the defendant required the jury to find and believe that plaintiff was oblivious to his danger.

8. ————: ————: **Compensation: Penalty.**  In a suit under the statute (Sec. 4217, R. S. 1919) against a railroad by a husband for killing his wife, it is not error to refuse an instruction asked by defendant telling the jury that "if you find the issues for plaintiff you must not, in arriving at your verdict, allow him any sum as compensation for the loss of the society and companionship of his deceased wife, or compensate him for his pecuniary loss as the result of her death," where there was no evidence of damage or pecuniary loss, and the jury were instructed for plaintiff that "if you find the issues for plaintiff, you will assess the penalty against defendant in the sum of not less than two thousand dollars and not exceeding ten

thousand dollars, in the discretion of the jury." Plaintiff's instruction was correct, and there was no evidence upon which to base defendant's.

Corpus Juris-Cyc. References: Appeal and Error, 4 C. J., Section 2625, p. 713, n. 68. Customs and Usages, 17 C. J., Section 88, p. 521, n. 51, 53 New. Juries, 35 C. J., Section 490, p. 421, n. 2 New. Pleading, 31 Cyc., p. 49, n. 68. Railroads, 33 Cyc., p. 45, n. 36; p. 1074, n. 20; p. 1086, n. 24 New; p. 1129, n. 68; p. 1130, n. 86; p. 1140, n. 35. Trial, 38 Cyc., p. 1711, n. 19; p. 1717, n. 24.

Transferred from Springfield Court of Appeals.

AFFIRMED.

*W. F. Evans, Geo. J. Grayston* and *Mann & Mann* for appellant.

(1) The petition states no cause of action. Sec. 4217, R. S. 1919; Grier v. Railroad, 228 S. W. 454; Midwest Nat. Bank v. Davis, 233 S. W. 412; Lackey v. Rys., 231 S. W. 956; Miller v. Rys., 233 S. W. 1066. No action can be maintained against the Director General of Railroads, under a state penal statute, such as the so-called railroad death statute, there being no provision for such suits made either by act of Congress, or the orders of the Director General. (2) The court erred in admitting over defendant's objection, the evidence as to the position and physical condition of the three occupants of the car after the collision. (3) Such incompetent testimony is presumed to have affected the decision of the jury and it constitutes reversible error. Wojtylak v. Coal Co., 188 Mo. 260; Russo v. Brooks, 214 S. W. 429; State v. Burns, 228 S. W. 769. (4) The court erred in overruling defendant's peremptory instruction in the nature of a demurrer offered at the close of plaintiff's evidence and renewed at the close of all the evidence. Plaintiff as he approached this track had an unobstructed view of the train for a distance of four hundred feet. He could have seen the train anywhere within this distance after he reached a point more than two hundred

feet from the crossing. According to his own testimony the last time he looked north in the direction of the train was when he was fifty feet from the track. He further testifies that his automobile was going not to exceed four miles an hour, and he could have stopped it instantly. In fact, it was going so slowly that he had to shift gears in order to keep going. He was guilty of negligence as a matter of law. Tannehill v. Railroad, 279 Mo. 158; Lyter v. Hines, 205 Mo. App. 429; Langley v. Hines, 227 S. W. 877; Underwood v. West, 187 S. W. 84; Burge v. Railroad, 244 Mo. 76; Mockowik v. Railroad, 196 Mo. 550; Sanguinette v. Railroad, 196 Mo. 466; England v. Railroad, 180 S. W. 32. (5) The petition does not state a cause of action under the humanitarian doctrine, for the reason that it is not alleged that plaintiff or his wife was oblivious to the danger and that his or their obliviousness was, or by the exercise of ordinary care could have been, apparent to the servants of defendant. Rulick v. Sandler, 219 S. W. 406; Haines v. Ry., 203 S. W. 632; Kamoss v. Ry., 202 S. W. 436; Knapp v. Dunham, 195 S. W. 1062; Pope v. Ry., 242 Mo. 236; Kinlen v. Ry., 216 Mo. 164; State ex rel. Railroad v. Reynolds, 233 S. W. 219. (6) The evidence was not sufficient to take this case to the jury under the humanitarian doctrine. Plaintiff was approaching the track, according to his testimony, at a constantly reduced speed and this speed was reduced to less than four miles an hour at a point twenty-five feet from the track. Under the circumstances the engineer and fireman were warranted in assuming that plaintiff saw the train, or knew of its approach; and that he would not suddenly and without any manifestation of such intention change his then position of safety into one of danger by shifting his gears and increasing his speed in an effort to cross the track ahead of the train. Alexander v. Ry., 233 S. W. 49; King v. Railroad, 211 Mo. 1; McGee v. Railroad, 214 Mo. 530; Burge v. Railroad, 244 Mo. 76; Guyer v. Railroad, 174 Mo. 344; Dyrez v. Railroad, 238 Mo. 33; Keele v. Railroad, 258 Mo. 78; England v. Railroad, 180 S. W. 32; McMiens v.

Railroad, 274 Mo. 331; Armstrong v. Railroad, 203 S.
W., 249; Martin v. Railroad, 227 S. W. 129.

*Owen & Davis, Norman A. Cox* and *Hugh Dabbs* for
respondent.

(1) Respondent's cause of action was grounded on
both primary negligence and the humanitarian rule of
negligence. Appellant interposed general demurrers to
the evidence, not limiting them to either ground of neg-
ligence, and these general demurrers were refused by the
trial court. Appellant then asked instructions covering
both primary negligence and the humanitarian rule of
negligence, and by so doing waived its right to urge its
general demurrers on appeal. Torrence v. Pryor, 210 S.
W. 432; Phillips v. Railway, 226 S. W. 863; Davidson
v. Hines, 246 S. W. 295. (2) The question of contrib-
utory negligence on the part of respondent was not a
question of law, but a question of fact for the jury, and
the case was properly submitted to the jury on that ques-
tion, and the jury found thereon for respondent. Monta-
gue v. Railway, 305 Mo. 277; Kibble v. Railroad, 285 Mo.
618; State ex rel. v. Trimble, 254 S. W. 850; Weigman v.
Railway, 223 Mo. 719; Hart v. Railway, 264 S. W. 906;
Jackson v. Railroad, 171 Mo. App. 452; Monroe v. Rail-
way, 280 Mo. 488; Grier v. Railway, 286 Mo. 532; John-
son v. Railway, L. R. A. 1918 A, 652; Campbell v. Rail-
way, 175 Mo. 172; Donohue v. Railway, 91 Mo. 364; Un-
derwood v. Railway, 190 Mo. App. 413; Woodward v.
Railway, 152 Mo. App. 475; Keller v. Railway, 164 Mo.
199; Hinzeman v. Railway, 199 Mo. 593; Ruenzi v. Payne,
231 S. W. 294; Rollins v. Railway, 251 Mo. 538; Kirk-
patrick v. Railroad, 211 Mo. 82; R. S. 1919, sec.
4217. (3) The case was properly submitted to the
jury under the humanitarian rule of negligence, and the
majority opinion of the Court of Appeals to the contrary
is in conflict with the ruling decisions of this court on
that question. Zumwalt v. Railway, 266 S. W. 724;

Montague v. Railway, 305 Mo. 269; Rollins v. Railway, 252 Mo. 538; Tavis v. Bush, 280 Mo. 383; Hale v. Light Co., 287 Mo. 499; Logan v. Railway, 300 Mo. 611; McGinnis v. Railway, 268 Mo. 678; State ex rel. v. Trimble, 260 S. W. 1002; Murell v. Railway, 279 Mo. 111; Preston v. Railway, 292 Mo. 453; Epstein v. Railway, 197 Mo. 720.

(a)   In considering respondent's right to go to the jury on the humanitarian rule it must be taken as true from the record that in approaching the crossing, appellant did not give the statutory signals as required by the statute. These signals being required, under the statute, for the benefit of the traveller and to prevent him from going into a place of danger, respondent was entitled, to some extent, to assume that appellant's locomotive would be sounding the statutory signals if it were near enough to constitute a source of danger to him in passing over the crossing. Not having heard a signal, because the train was approaching without warning, appellant's failure to sound the signals caused respondent to go into a place of danger. This being true, appellant by its negligence in failing to give the statutory signals, created the dangerous situation which resulted in the death of respondent's wife, and therefore appellant had no right to presume that respondent would stop before reaching the crossing, while it was violating the very statute which is designed to notify the traveller that a train is approaching. Ruenzi v. Payne, 208 Mo. App. 127; Jackson v. Railway, 189 S. W. 383; Campbell v. Railway, 175 Mo. 172.

SEDDON, C.—This is an action brought by plaintiff to recover a sum of not less than $2,000 or more than $10,000, under and by virtue of Section 4217, Revised Statutes 1919, for the death of his wife, who died by reason of injuries inflicted when the automobile in which she was riding, and which was driven by plaintiff, was struck by a train, consisting of a locomotive, tender and caboose, operated under Federal control by employees of the Director General of Railroads, on a public road

crossing near Joplin, Missouri, at or about 4:30 o'clock on the afternoon of February 23, 1920. Verdict and judgment *nisi* were for plaintiff in the sum of $5,000. The cause was appealed to the Springfield Court of Appeals, which court, by majority opinion, reversed outright the judgment below. One of the judges of that court filed a dissenting opinion, and deeming the majority opinion of that court to be in conflict with our own ruling in Campbell v. Railway Co., 175 Mo. 161, asked that the cause be certified to this court for final determination pursuant to Section 6, Amendment of 1884 to Article VI, Constitution of Missouri. The majority and dissenting opinions in the Springfield Court of Appeals are fully reported in Anderson v. Davis, 251 S. W. 86.

On the day in question, plaintiff, accompanied by his wife and baby, was traveling in a Maxwell automobile on a public road from Joplin to Carl Junction. As the automobile was about to clear the railroad track of the St. Louis-San Francisco Railway Company, intersecting said public road, the locomotive of the train struck the rear right wheel of the automobile, throwing the occupants therefrom, and causing injuries to plaintiff's wife, from which she died a short time afterward. The petition upon which the cause was tried charged defendant with negligence in these respects: Failure to keep a reasonable and proper lookout for persons and vehicles approaching and crossing over said crossing; operating said locomotive and train at an excessive and dangerous rate of speed; failure to give the statutory signals, by either whistle or bell; failure to give plaintiff warning of the approach of the train; and "that the agents, servants and employees of defendant in charge of and operating said train at said time and place, saw, or by the exercise of ordinary care could have seen, plaintiff and his said automobile approaching and on said public crossing in a position of peril in time, by the exercise of ordinary care, to have warned plaintiff, by bell or whistle, of the approach of said train, or in time to have checked the speed of said train or to have stopped the same and avoided

striking said automobile and causing the injury hereinafter set out, but that said officers, agents and servants in charge of said train negligently and carelessly failed to give such warning and negligently and carelessly failed to so check the speed of said train or to stop the same.''

The answer is a general denial, and pleas of contributory negligence, respectively, of plaintiff and his wife.

The public road on which plaintiff and deceased were traveling runs east and west. The automobile was traveling west, approaching the railroad crossing from the east. The general direction of the railroad track immediately at the road intersection is north and south, and the train was approaching from the north, being southbound. The railroad track from the crossing south is straight. Immediately east of the track and south of the road is an open field and, approaching the track from the east, there is nothing to obstruct the view of the track south of the road for approximately a half mile. North of the road, the railroad track curves somewhat sharply to the northeast. Approximately four hundred feet north of the road and east of the railroad track is the point of a hill, sloping upward from a point four hundred feet from the road sufficiently to obscure the view of the road from the track and also to obscure the view of the track from the road. The evidence indicates that this hill near the east side of the railroad track obscures the view of one approaching the crossing on the road from the east until a train upon the railroad track reaches a point approximately four hundred feet north, or northeasterly, of the road; likewise, the view of the operatives of a train approaching the road from the north is obscured until the train reaches the point of the hill, approximately four hundred feet from the road. On the north side of the road and approximately three hundred feet east from the track were some tailing piles. Between the tailing piles and the track, on the north side of the road, there were some trees and underbrush, but these were apparently not so many in number or so close together as to obstruct the view of a train after it reached the point approxi-

mately four hundred feet north, or northeasterly, of the road crossing. Certain photographs, identified by witnesses and put in evidence as exhibits in the record before us, indicate that a train with the pilot of the locomotive stopped four hundred feet north, or northeasterly, of the road may be seen by a person stationed at a point in the center of the public road one hundred fifty feet east of the railroad track. The railroad track is slightly down grade from the north to the crossing. The road is slightly higher as it crosses the track than at a point fifty feet east of the track. The east railroad right-of-way fence is about fifty feet east of the track. According to plaintiff's testimony, "the road is well graded and chatted, good, smooth road all the way, and the chatted road is about twenty-five feet wide. The [railroad] crossing was smooth. There were planks on both sides of the rail and chatted in between, like the rest of the road." So much for the physical surroundings at the scene of the catastrophe.

Plaintiff testified: "As we approached the Frisco crossing, I observed some tailing piles about three hundred feet east of the track, and there is a hill there and some trees and brush, fence posts. We had the curtains on the north side, all the curtains on the north side were up. The curtain on the south, the back part of the car was curtained but the front was open. In approaching the crossing we was driving along there and my wife and I were talking as we usually do and we came up, oh, probably three hundred feet from the driveway or crossing there; we drove out around a horse and wagon that was there, driving on up to the right-of-way fence to probably fifty feet from the railroad, we slowed down our speed until, I judge, three or four miles an hour. I was driving, as I got inside the right-of-way fence, and our attention had been on the railroad from the accident that had previously occurred. We was talking about that and I took a look to the north and saw no train, heard nothing, then I turned again and looked to the south, the car was moving on toward the track, and reached over and

shifted the gear until I got to the point where it wasn't running like it should, it was kind of a coast as it came in there, and I shifted the gear and started on; I was up probably then some twelve or fifteen feet of the track, that would be my judgment. At that time, I shifted the gear and started on and about that time my wife cried out and says, 'There is the train.' I looked and saw the train and heard the whistle. From that on I don't know what occurred. That is the last I remember. We had been listening for the train, but we got up in three or four hundred feet of the track and we were trying to look to the north and south; it was open to the south and we could see very readily but we were trying to see the north.

"Q. Could you see to the north?. A. We could see the hill and brush, but you couldn't see around the bend until you got up probably two hundred feet of the track; then we could see a part of the track. I never heard any whistle or sound of any kind. Just previous to the striking of my car I heard two short blasts of the whistle.

"Q. Just describe, if you can, how that train comes around the curve, what is up there and how it approaches that crossing. A. In observing since that, the train at about two hundred fifty or three hundred feet, and you can see from the right-of-way fence, you can by looking closely, you can probably see a train coming around the bend.

"Q. Why can't you see it before that? A. On account of the hill and timber and old tailing pile.

"Q. Is there anything then, how does the train approach there; is there any cut or anything that it comes around there to that curve? A. Yes, it is behind a hill and tailing piles for quite a distance, I don't know just how far, up to within about three or four hundred feet and it is entirely out of sight. It is down grade until we come up to the track and then there is a raise there probably about two or three feet.''

Cross-examination: "We turned onto this road on which the accident occurred, the east-and-west road, at the little store about a half a mile east of the crossing.

"Q. After you turned west at the store and started on west, what rate of speed were you traveling? A. Probably fifteen or twenty miles an hour; I didn't have a speedometer; couldn't tell exactly, but that is my judgment, something like that.

"Q. Where were you going with reference to the track at the time you passed that spring wagon? A. Well, something like seventy-five to one hundred yards. Possibly not quite that far. The last tailing pile is where I passed the wagon—at the middle of the tailing pile, something like that.

"Q. You were driving at what rate of speed when you passed him, fifteen or twenty miles an hour? A. Well, something like that, yes.

"Q. As you approached the track you, of course, were familiar with this crossing? A. Well, I had crossed it before.

"Q. And you had crossed it time and time again? A. Several times.

"Q. Over a period of several years? A. No, not more than a year.

"Q. How often had you driven over this crossing? A. I wouldn't be able to say, but I presume two or three times a month at least.

"Q. Covering a year's period? A. Yes, something like that.

"Q. Now, then, how slow did you get your automobile to going then? A. When I got to the right-of-way or when?

"Q. When you reduced it to the slowest—lesser rate of speed? A. About three or four miles an hour, I presume, the slowest rate.

"Q. Where were you then? A. Within the right-of-way; about the time I came to the right-of-way, I controlled my car down until it was running something like three or four or five miles an hour.

"Q. You mean opposite the fence, fifty feet from the tracks? A. That is what I mean.

"Q. For what distance east of the right-of-way fence had you been running at a speed of five miles an hour or less? A. I don't suppose I had but a very short distance.

"Q. Fifty feet? A. Probably twenty-five or thirty feet before that. Twenty-five or fifty, somewhere along there.

"Q. You were running in high all the time? A. Yes, sir.

"Q. From a point twenty-five to fifty feet east of this right-of-way fence, which is fifty feet east of the track, you had gotten your car down to five miles an hour or less, from three to five miles an hour? A. I don't know that it was less than that.

"Q. And you continued at that rate of speed until what point? A. Until after I had passed the right-of-way fence and was inside, half-way between the right-of-way fence and the railroad, or about twenty-five feet.

"Q. Did you have any difficulty in running that car at that rate of speed in high? A. Not particularly.

"Q. It wasn't jumping or bucking? A. Not until it got down to three or four miles an hour or slower.

"Q. Then is when you shifted gear? A. Yes, sir. Intermediate.

"Q. Or second? A. Yes, sir.

"Q. Where were you when you first looked in either direction? A. Well, when I first began looking particularly I was possibly one hundred feet from the crossing.

"Q. Now, which direction did you look then first? A. Well, I looked to the north.

"Q. Then you were one hundred feet from the track. Then what did you do; you looked to the south, did you? A. Looked over to the south.

"Q. Where do you say you were with reference to the track when you looked to the south? A. I was up

something like twenty-five feet from the right-of-way.

"Q. When you looked south that time you could see the entire half mile of the straight track to the south? A. Well, I don't remember. I suppose I did. I looked over the field there.

"Q. You saw no train coming from that direction? A. No, sir.

"Q. Then you looked to the north again, did you? A. Yes, sir.

"Q. That was just after you got to the right-of-way fence? A. Just as I came inside the right-of-way. I began looking just as I got to the right-of-way fence.

"Q. Did you look in either direction after you passed that point. A. Why, certainly I did.

"Q. Where did you look the next time? A. I continued to look to the north and listened for the train to whistle or ring the bell, if there was any train there.

"Q. Do you tell the jury now you looked north after you passed the right-of-way fence? A. After we passed the right-of-way fence, it was then I took close observation to the north.

"Q. And then turned which direction? A. South.

"Q. And never looked to the north again until your wife called your attention to the train? A. No, sir.

"Q. You did not look north again, did you, until your wife called your attention? A. No, I didn't look north.

"Q. You were then running at what rate of speed? A. Something like three or four miles an hour.

"Q. You kept your eyes to the north for a period covering twenty-five feet, you say that? A. Possibly that far; yes.

"Q. Where were you when you shifted your gears again? A. Something like twelve or fifteen feet from the track.

"Q. You had been running in high all the time? A. Yes, sir.

"Q. You didn't change to intermediate until you got to within twelve or fifteen feet of the track? A. Something like that.

"Q. Then you changed to intermediate because the speed of your car had gotten down to the point so slow you had to shift gears? A. Yes, sir.

"Q. If you didn't do it, it was going to stop, kill your engine? A. Possibly would.

"Q. Then about where you shifted gears, the grade started to rise up toward the track? A. Just about that point where the incline stopped there it began to rise.

"Q. Now, then, when you went into intermediate, you gave the car more gas, did you? A. Yes, sir.

"Q. And speeded up? A. Yes, sir.

"Q. Now, with your car almost dead on you there, which necessitated your shifting your gears, had you seen the train? If you had seen the train at that point, of course, you could have stopped instantly? A. If I was back far enough, I could.

"Q. I am talking about when you was twelve or fifteen feet from the track when your car came near dying on you because of slow speed, if you had seen it then, you could have stopped in a foot or two? A. I don't know.

"Q. What is your judgement? A. I could have stopped the car if I had known the train was there.

"Q. Had you shifted your gears at the time Mrs. Anderson called your attention to the train? A. I was just shifting them at that time. That was just as I shifted the gear and was going on.

"Q. At what rate of speed were you going when she hollered? A. I don't know just what it was, but in the course of a few feet you wouldn't gain very much speed.

"Q. Well, were you going six miles an hour or seven? A. Possibly might have been; I don't know whether it picked up that much speed or not.

"Q. Did you ever see the train? A. Well, I saw it; yes, sir.; I saw a glimpse of the train coming on to

me. About the same time she hollered I looked. I saw the train about the same time she hollered. It seemed to me practically on us. All the occupants of the car, my wife and myself and the baby were all on the front seat of my car.

"Q. Mr. Anderson, I want to ask you a little to refresh your memory about your former testimony in the other trial (reading:) 'Q. Where was your automobile when you attempted to shift gears? A. I presume about twenty to twenty-five feet back of the track.' A. That is about the same place.

"Q. You testified this time you was twelve or fifteen feet from the track when you shifted gears. A. No, twelve or fifteen feet when she cried out.

"Q. When you shifted gears, you were twenty to twenty-five feet from the track? A. Something like that."

Gus Tingle testified on behalf of plaintiff: "I noticed the train whistled up about a mile away at the Tuckahoe crossing. Q. Did you see the train when it whistled. A. No, it was a mile away when it whistled. After that time I did not hear it whistle again. I was in a position to see and observe the situation there at that time. I never heard no bell. I was in a position to hear. When I first saw the train it was about twenty feet of the car. I heard the whistle blow just before it struck the car. The first time I noticed the train was when it gave three short blasts in about twenty feet of the car; then I run to Mr. Anderson, run out there. When this blast was blowed the train struck Mr. Anderson's car; it turned it right around and headed it south. The train stopped one hundred fifty feet, something like that, down the track, south of the crossing. The railroad crew come back and loaded them on the train and took them away."

Cross-examination: "The first time I saw the train at all was when it was about twenty feet from the car. The engine was right at the cattle-guard on the north side of the public road. When they gave the three

short blasts it attracted my attention, then I looked up and saw the train hit the car. I hadn't seen the automobile until I saw the train. I saw them both when I looked. The automobile was on the track when I saw it; just looked up and saw the car and train both right there together. The automobile was about the center of the public road. The front wheels had left the track at that time; the engine hit it over the back wheel. The automobile came near getting across. Hit the back end of it right over the rear wheel."

Walter Tingle testified on behalf of plaintiff: "The train didn't whistle until it was about a mile away up at Tuckahoe. I first heard it at Tuckahoe, a mile away from our house. I did not hear it again until—well, in about ten feet of the machine it give two short blasts just before it hit the machine. It didn't ring any bell. They didn't whistle only at Tuckahoe crossing about a mile away, and then two blasts at our house. That is all the whistling that occurred. The train went on about fifty yards and stopped and backed back."

Cross-examination: "The accident happened about four-fifteen in the afternoon, it was broad day light. I looked up just as the train come around the curve, around that little knoll that is about four hundred fifty feet north of the crossing—right at that. I watched it until it got to the crossing, just stood there and watched it. The automobile when I first saw it just come over a little hill and came on down the road there. I saw it pass Mr. Friend's wagon. I didn't see Mr. Friend wave to him. I couldn't hear Mr. Friend call; he was too far away. I did not see him wave his arm. The automobile was going about five miles an hour, something like that. It passed the wagon about ninety yards, something like that, from the track; ninety steps—I stepped it off. I saw Mr. Anderson coming down the road, him and Mr. Friend, and I says to my brother, 'I bet Mr. Friend gets hit by the train,' and he says, 'Maybe not,' and the machine passed Mr. Friend after the train come around the curve. Mr. Anderson passed Mr. Friend about the

time the train come around that little curve there about four hundred feet from the track. The point where Mr. Anderson passed Mr. Friend is ninety steps east of the track. I stepped it off just like that; I make about a yard to the step, the way I step is about three feet. I guess ninety steps would be two hundred seventy feet. Mr. Anderson was driving five miles an hour, something along about that; I couldn't tell. After I saw him he slowed down, slower than five miles an hour when about thirty feet of the track—oh, farther back than that— about half-way between Mr. Friend and the track he slowed down and then he drove that way for a little ways and then speeded up to get across the track. When he slowed down he was running about five miles an hour; just between him and Mr. Friend he slowed down, I guess to look to see if the train was coming, and then speeded up after he got close enough to see. He was about fifteen feet of the track when he began to speed up. Well, he speeded up to hurry across the track; he had on his curtains, I couldn't see him or whether he looked toward the track.''

Plaintiff also introduced the testimony of other witnesses tending to show that no whistle was sounded for the road crossing and that the locomotive bell was not ringing at the time of the collision. At the close of plaintiff's case, defendant offered an instruction in the nature of a general demurrer to the evidence, which was overruled.

Andrew Friend testified on behalf of defendant: ''I was going home from town at the time this accident occurred. I was driving a one-horse spring wagon. Had been to Joplin and was returning home. When I first saw this automobile that was later struck on the crossing, I was something like two hundred or two hundred fifty feet east of the crossing. I was going west, approaching the crossing. I first discovered the presence of the automobile when they got up pretty close to me; he honked his horn just before he got to me. I was out on the right-hand side of the road and I just drove along as

usual. Before he passed me I heard the whistle. I could not see the train when I heard the whistle. In my opinion, the train when it whistled was about a quarter of a mile, I suppose, at the whistling post, which is about a quarter of a mile north of the crossing. That is the only railroad track anywhere in that neighborhood. I heard that whistle before this automobile got to me. I afterwards learned that was Reverend Anderson that passed me there. Just as he passed me, I threw out my hand and hollered: 'There is the train coming,' just as the car passed me. So far as I could tell he gave no heed to my warning. My best knowledge is the automobile was going about something like twenty miles an hour when it passed me. The automobile continued on west toward the crossing. When I saw the train come in sight around the curve there the automobile was close approaching the track. As far back as the right-of-way fence, something about that distance. He was something like one hundred, maybe one hundred fifty feet, ahead of me at that time. I never measured the ground, but something in that distance. The speed of this automobile was not reduced or lessened at any time after it passed my horse and me until the automobile was struck. I never seen any action of being slowed up at all. It was right there in front of me all the time. The automobile seemed to travel at about the same rate of speed as it went on down there. I heard it [the train] whistle the second time something like two hundred or three hundred feet as they approached around the curve a short distance, between two and three hundred feet. There were three sounds of the whistle at that time; then they gave a short whistle just as they struck the car, just a short whistle, just one toot. From where I was back one hundred or one hundred fifty feet from the track I first saw the train when it was about that distance, about three hundred feet, I guess, between two hundred and three hundred feet up the track, when I first seen it approaching around the curve. That was after it came around the little hill. I did not measure up to that little hill at

any time; just estimated that distance. I did not have any difficulty in seeing the train through the trees there after it came around the bluff. There was nothing that obstructed my view of the train after it got by the bluff. After it came around so the bluff did not hide the view of the train, I could see it from that time until the train got clear to the crossing. The automobile was mostly across the track when it was struck; seemed like it was struck in the back part. When I say across I mean west of the track.''

Cross-examination: ''The accident happened something like 4:30. The first thing I observed of Mr. Anderson, he honked his horn notifying me he was going around me. I had heard the whistle then just a short distance before Mr. Anderson passed me. I never measured, but Mr. Anderson passed me something like three or four hundred feet from the railroad, back up there by the tailing pile. At the time Mr. Anderson passed around me I could not see the train. It had been a few minutes before that that I had heard it up the track. I threw out my hand and told him, 'Train is coming.' He was three or four hundred feet from the track then, something like that. When he got closer, I thought he was going to be hit by the train, but at the time I threw up my hand I did not think then he was going to be hit by the train when he was three or four hundred feet away. I didn't know Anderson; never saw him before. After he passed me the train whistled a second time, and at the time it whistled the second time I could not see it. It was still down in that cut behind that hill. When it whistled the second time Mr. Anderson was then just in front of me, something like three hundred feet from the crossing. I never measured the distance. Just a short time after it whistled the second time, the train came out from behind that hill and out of that cut. I couldn't say how many minutes or seconds. From the position he was in and from the position I was in, we both could observe and see about the same thing down the road, and neither one of us could see the train from those

different positions. Not at that time. I continued to advance slowly toward the track, in a slow walk. I don't know just how close I got to the track before I saw the train, but I was over one hundred feet when I stopped the rig. The train then had come out of the cut around the point of the hill and had come in collision with Anderson when I stopped my rig. At that time I was something like one hundred feet away. I never measured the ground. Mr. Anderson had run on the track. When I first saw the train Anderson was something like ten or fifteen feet from the track.''

The engineer of the train testified on behalf of defendant: ''As I came to the crossing whistling post for the crossing that the accident happened at, I whistled the crossing signal again, two longs and two shorts; that is about a quarter of a mile from the crossing where the accident happened, north. The next signal I gave after that was just before it came through the cut on the other side of the crossing about five—between five and six hundred feet from the crossing. That is where I whistled the next time. I gave two longs and two shorts. I was sitting on my seat box on the right-hand side as I approached that crossing; going south, that would put me on the west side. Between that cut I spoke of and the crossing, the track is on a curve; it extends to the cattle-guard on the south side of the crossing. That would put me, as I approached that day, on the outside of the curve. As I sat in the cab of my engine on the seat box, the boiler in the front part of my engine extended higher than my head. I could not see across on the public road over my engine to the east. The boiler of the engine also obstructed my view ahead; it extended out in front of my cab where I was sitting about twenty-feet—from the cab out to the front end. On that occasion I would have to be about fifty feet, probably, to the public road before I could see the track on the public road. When I got within fifty feet of the public road I couldn't see the center of the track; I probably could see the cattle-guard or the approach to the crossing;

I could not see either rail on account of the curve and the boiler. I was running about twenty-five miles an hour as I came around that curve and between the curve and the crossing. I gave two blasts of the whistle after I got a signal from the fireman to stop. The bell was being rung. I don't know exactly where the fireman started it, but he was up on the seat box ringing it, I know, before we got to Tuckahoe. It was ringing after we passed the whistling post for this crossing, and it was ringing all the time from the time we got past the whistling post for this crossing until you got to the crossing. The first notice or knowledge I had that this automobile was approaching that crossing was when the fireman hollered at me. He raised up on his seat and give a yell and says, 'Stop 'er.'

"Q. How far were you from the center of the public road at that time? A. Well, between seventy-five and one hundred feet. I reached the brake valve and put the brakes in emergency. I had to take my hand off the throttle and reach down and get the brake valve.

"Q. What distance did you travel, in your estimation, or if you know, after the fireman called to you and before your brakes took hold to reduce your speed? A. Well, that would be pretty hard to state just how far. It would take them probably half a second before the brakes took some time, you know, probably go twenty-five or thirty feet. I stopped it as quick as I could before I got to the crossing, but I could have stopped quicker after I hit them, but it wouldn't have done no good then, because the accident had happened, by putting the engine over. If I had put her in reverse, it was liable to turn the engine up and the accident had done happened then.

"Q. How far beyond the crossing did you stop? A. About one hundred twenty-five feet.

"Q. Did you at any time prior to the collision see this automobile? A. No, sir.

"Q. I will ask you whether or not with the appliances you had at hand and under the conditions as they

existed at that time, whether it would have been possible for you to have stopped that train after you got word from the fireman and before your train reached the crossing? A. No, sir; could not.''

Cross-examination: ''Q. Now, when you come around that little corner where your fireman could see this crossing, you was about how far from this crossing? A. About four hundred feet.

''Q. From the time you gave your whistle, your two longs and your two shorts at the six hundred-foot station, you did not slacken your speed until you had the cry from the fireman to stop, did you? A. No, sir.

''Q. And it was traveling over the road at about twenty-five miles per hour? A. Yes, sir.

''Q. Your fireman could see the crossing and see on each side of that crossing, and especially on the east side, for one hundred to one hundred fifty feet, couldn't he? A. Yes, sir.

''Q. That was in perfectly plain view, was it not? A. Yes, sir.

''Q. This is a dangerous crossing, isn't it? A. Yes, sir, it is. I knew it was a dangerous crossing.

''Q. After you reached the four hundred-foot point, what would be the shortest possible time in which you could have stopped that engine and caboose? At the speed you were going—twenty-five miles per hour? A. I don't know, hardly, what time it would take. It would take probably thirty seconds, I guess.

''Q. I am not asking about seconds, I am asking you space, what space, how many feet? A. Well, in about two hundred feet.

''Q. You think you could stop in two hundred feet? A. Yes, I could by reversing the engine.

''Q. Could you reduce the speed at all going over the space of one hundred feet? A. Yes.

''Q. Approximately how much, if going twenty-five miles an hour, you can reduce it how much? A. You can reduce it about ten miles.

"Q. When you struck this automobile, you barely struck the hind part of it with the outer part of your car, didn't you? A. Yes, sir.

"Q. Had the automobile been three inches farther forward you would have missed it entirely, wouldn't you? A. No. If it had been a foot farther I would have missed him. I think I hit about the center of the wheel.

"Q. You were not running on steam? A. No, sir, drifting.

"Q. Coasting? A. Yes, sir."

The fireman of the train testified for defendant: "I was sitting on the seat box on the left side. There is a crossing sign board, whistling board, for this crossing where the accident occurred, about a quarter of a mile north of the crossing, around the curve. He whistled two longs and two shorts for the crossing, and I began ringing the bell. I continued ringing the bell until we passed over the crossing. He whistled the railroad crossing signal. I presume about half-way between the whistling board and the crossing. Two longs and two shorts.

"Q. What were you doing when you came around that hill with reference to the position you were in? A. Sitting on the seat box ringing the bell.

"Q. Did you see this automobile as it approached the track? A. Well, I seen it a little ways back of the track, yes.

"Q. Where were you when you first saw it; how far was the engine back from the crossing when you first saw the automobile? A. Possibly one hundred feet or one hundred fifty feet, somewhere in that neighborhood.

"Q. Where was the automobile then? A. Well, I don't know; it was probably back about one hundred feet or such a matter when I first noticed it.

"Q. Can you estimate the speed at which the automobile was coming? A. About twenty miles an hour, I judge.

"Q. Was there anything that indicated to you whether or not the driver, of that automobile would stop that automobile before it got to the track? A. He never slowed up any or anything.

"Q. He didn't slow up any? A. No.

"Q. How close was you to the road crossing when it occurred to you—when you formed your impression, if you did form an impression, that the automobile was not going to stop? A. Somewhere about one hundred feet from the crossing.

"Q. Now, where was the automobile then when you formed that impression? A. Well, I don't know. He got a little closer than he was at first; I don't know how far back he was.

"Q. Had he reduced his speed then? A. Not that I noticed.

"Q. Had he reached the right-of-way fence? A. I don't believe he had.

"Q. Tell the jury in feet, if you can, about how far he was from the track, east of the track, when it occurred to you he was not going to stop? A. Oh, he was between seventy-five and one hundred feet, I guess, back from the track.

"Q. And at what speed was he running the automobile at that time? A. About twenty miles an hour.

"Q. At what speed was your train going? A. About twenty-five miles an hour.

"Q. Then when you formed that impression, what did you do? A. I hollered to the engineer that would do, stop, and he applied the air and emergency. I gave him a sign also, hollered to call his attention and gave him a signal with my hand.

"Q. You heard the brakes set, did you? A. Yes, sir.

"Q. How long was that after you signaled the engineer? A. Almost immediately; just about as quick as he could act and get hold of them. I was watching the automobile and ringing the bell. I had done all I could do."

Cross-examination: "Q. That was a matter, more or less, of a guess, because it was just seconds, hardly seconds, just fractions of seconds after you saw the automobile until you hit it, wasn't it? A. It wasn't long; I don't know how long it was.

"Q. When you come out of the cut, does it [the track] not keep curving around to the east or south clear up to the crossing? A. I think the crossing is pretty near the point of the curve there.

"Q. Then looking from the corner where you come out where this land is, you would look across there and see that crossing and see the road east of it, wouldn't you? A. Yes.

"Q. When you came out of that crossing, were your eyes down in that direction watching that crossing? A. Down the track, yes, sir.

"Q. You recognize that is a dangerous crossing, don't you? A. Yes, sir.

"Q. When you came out from around that crossing there, where did you see this man's automobile that you struck, just when you came out where your eyes went down there when you seen him? A. I don't think I seen him at all when we first came out of the cut.

"Q. You was down about three hundred feet when you saw him, was you not? A. I don't know. Maybe it was about three hundred feet; I don't know how far it was.

"Q. By reason of the fact you know that is a dangerous crossing, you was taking in as much territory as you could with your eyes? A. I hardly ever look down the road for them; I look down the track.

"Q. You don't mean you keep your eyes on the two rails? A. No, not altogether.

"Q. You attempt to extend your vision from fifty to one hundred feet on each side of that track coming around there, don't you? A. Yes, sir, something like that.

"Q. You did extend your vision out there and you did actually see the automobile? A. I seen the automobile when he drove around the wagon.

"Q. You were then about three hundred feet north? A. I don't know how far I was north.

"Q. I will ask you if you didn't make this statement: 'The first I seen of the automobile was it drove around the wagon and looked like the wagon was stopped about seventy-five feet from the track when the automobile went around it. I seen it did not stop and hollered to the engineer to stop. I thought it got across, but he told me we hit it.' Do you remember making that statement? A. I remember making a statement there. So far as the feet there, it is all guess work.

"Q. It was a mere estimate of your judgment whether you say seventy-five feet or one hundred fifty feet, when you first saw the automobile, is just a mere guess of yours, isn't it? A. Yes, sir.

"Q. When you came around out of that cut and you were about four hundred feet from the track [road?]; now, had you seen this man, this automobile, at that time and thought it necessary to do so, you could have stopped that train without ever hitting him on that crossing, couldn't you? A. I don't know whether the car was up far enough for me to see him at first.

"Q. I say, suppose that automobile was within one hundred fifty feet of that track when you came around out of this cut— A. And I was back four hundred feet?

"Q. And you was back four hundred feet? A. He could have got across the track and we would never hit him.

"Q. But if you had; suppose he didn't get across the track, you could have stopped your train? You could have stopped the train then, as I understand you, before it reached the crossing, if you saw and thought there were danger? A. I don't know.

"Q. And you made no effort to stop quick until after you had already done the harm to the woman? A. We done all we could do before we hit the car.

Anderson v. Davis.

"Q. As a matter of fact, in your opinion, that train could have been stopped in emergency in one hundred feet? A. No, I wouldn't say that.

"Q. Did you check it any from the time you hollered to the engineer and it struck this automobile, was the speed checked any? A. Yes, sir.

"Q. You could then check it in fifty feet, couldn't you? A. Check it some, yes, sir.

"Q. You were not more than fifty feet from this woman when you gave the alarm signal, was you? A. I think farther than that.

"Q. Seventy-five feet? A. Probably one hundred feet.

"Q. And you know you did check the train up before it struck the automobile? A. Yes, some.

"Q. Then so far as you are able to testify to the facts, the front part of this automobile might have been within fifty or one hundred feet of this track when you first saw it? A. No, it wasn't within fifty feet of the track, I don't think.

"Q. So far as you know it was fifty or one hundred feet of the track when you came around out of the cut. You couldn't say as a fact that it wasn't, could you? A. He would have to be standing still there if he was. He undoubtedly drove up there.

"Q. Didn't you see a wagon that was standing still there? A. Yes, sir.

"Q. You estimated that to be some distance back? A. Yes. Probably one hundred feet, maybe more; maybe not quite so far.

"Q. Now, if it was one hundred feet, since he came around that wagon, he was immediately fifty feet closer to the line? A. I don't think the wagon is fifty feet long.

"Q. He was moving rapidly when you saw him? A. Yes, sir, he was traveling.

"Q. You knew when you saw that automobile come around that wagon rapidly, it was a matter of seconds

until it would be on this crossing, didn't you? A. Yes, sir.

"Q. And you also knew it was a matter of seconds when the train would be there? A. Yes, sir.

"Q. And you didn't know but what there might be a collision right at that second, did you? A. No, sir.

"Q. You waited until he got closer to the road before you gave the alarm? A. No, I gave the alarm after he got around the wagon.

"Q. You was three hundred feet away from the track [road?] at that time when he came around the wagon, wasn't you? A. I don't know; I don't think so."

The conductor of the train testified for defendant: "As we came down that track I was sitting on the right-hand side of the cupola of the caboose. I saw the automobile pass the wagon standing in the road east of the road crossing. I watched it as it went around the wagon until it got to the track. After it went in front of the engine, I stuck my head out the window on my side and saw that the engineer had hit the back end of the car. The train was running about twenty-five miles an hour. The automobile was running, when I first saw it, between fifteen and twenty miles per hour, I should judge. The speed of the automobile was not changed any after I first saw it, not from the time it passed the wagon until it went in front of the engine. I was out there yesterday and stepped off to where I am positive this wagon was standing and it is at least two hundred feet."

Cross-examination: "The regular signals were given there for that crossing. The bell was ringing at that crossing. The first time that that crossing comes in view on that train going south is about four hundred feet back from the crossing. I was in as good a position to see as the engineer or the fireman. I can see it from my position in the cupola about the same time the fireman can see, it. The engineer has no view of the crossing at all. He is on the right-hand side of the engine going south. I was looking through the east windows

of the cupola. When we were about four hundred feet north of the crossing, travelers on the east side of the crossing come under the eye of the fireman and myself. At about that point I saw the automobile go around the wagon. The wagon was standing still. I was out there yesterday and I am very positive the wagon was setting two hundred feet from the crossing. At the time of the accident I never paid any particular attention to just where the wagon was standing. At the time I saw this automobile it was traveling fifteen to twenty miles an hour. It went around the wagon; about the first I saw of it was while it was going around the wagon. And I was interested to see whether or not it was going to escape injury and I was then about four hundred feet from the crossing. I noticed the brakes applying in emergency on the train about one hundred feet, I would judge, from the crossing. When I was in four hundred feet, I could see, if that automobile kept traveling at the rate of speed it was traveling, it would probably come in contact with the engine on the track."

Re-direct examination: "Q. I will ask you, when you saw this automobile come around the wagon about two hundred feet away, running at fifteen to twenty miles an hour, whether or not there was anything at that time to indicate whether the driver would try to beat the train across or whether he would slow down and stop? A. The man passed the wagon and he had sufficient time at the speed he was running to have stopped and there was nothing to keep him from hearing the train and stop, and no reason for us to stop because we had every reason in the world to think, after giving all proper signals and the fireman sitting there ringing the bell, that the man driving the automobile knew we was coming and intended to stop at any time.

"Q. How close was he to the track before you realized he was not intending to stop? A. He was within forty or fifty feet of the track when I realized he didn't intend to stop; he had every indication of trying to beat us over the crossing."

Re-cross examination: "I saw him and was watching him when he was one hundred fifty feet away from the track; he was then running at fifteen or twenty miles an hour, I judge. I was watching to see whether or not he would slack down. I did not think that, if he kept going as fast as he was, he would get over the track before our engine got there. I had my own mind made up if he went in front of that engine he would get hit if he kept on going at the rate of speed he was going. I had no signal cord or no way to give a signal whatever. I knew the fireman was nearer, but whether he was looking, I didn't know. I knew I saw him and that is all. When I first saw the car I saw there was a man driving. We was about three hundred or four hundred feet from the crossing at that time."

Witness Cullifer, a brakeman on the train, was sitting in the cupola of the caboose on the east or left-hand side. He testified for defendant: "The first I noticed the automobile was when he set the air. I felt the air applied in emergency and looked up and saw the automobile about twenty feet from the track. At that time I guess we must have been back fifty or sixty feet from the crossing the first time the brakes were applied. I don't know whether he sounded the whistle right then or not; the first thing I noticed the air set. When the air set, I looked out ahead to one side there. All I saw then was the automobile, I should judge, about twenty feet from the track. Up until that time I don't know anything about the situation."

The testimony of other witnesses on behalf of defendant tended to show that the crossing whistle was sounded and that the bell was ringing as the train approached the road crossing.

At the close of all the evidence, the defendant again asked the court to give an instruction in the nature of a demurrer to the evidence, which request was refused. Thereupon, the cause was submitted to the jury upon certain instructions given upon the request of the respective parties. Defendant requested the giving of cer-

tain instructions, refused by the trial court, the nature of which, if necessary, will be hereafter referred to in the opinion.

I.   At the outset, appellant contends that the petition states no cause of action because the Missouri statute (Sec. 4217, R. S. 1919), under which this action is brought, has been held by this court to be penal in its nature and purpose, rather than compensatory, in Grier v. Railway Co., 286 Mo. 523; Lackey v. Railways Co., 288 Mo. 120; and Miller v. Railways Co., 233 S. W. 1066. It is, therefore, asserted that no action can be maintained against the Director General of Railroads, or the United States Railroad Administration, under a state penal statute, there being no provision made for such actions either by act of Congress, or by the orders of the Director General, issued and promulgated in pursuance of the Federal Control Act of Congress of March 21, 1918. The precise question was before this division of this court in McDaniel v. Hines, 292 Mo. 401. The same authorities of this court and of the Federal Supreme Court were cited by appellant in that case and considered and distinguished by this court, and we then arrived at the conclusion that the purpose and terms of the statute did not preclude a recovery thereunder in an action against the Director General of Railroads for death caused by negligence of his employees while the railroad was being operated by him under Federal Control. The same point was before this court, En Banc, in the subsequent case of Pryor v. Payne, 304 Mo. 560, and was held to be untenable. The question is, therefore, no longer an open one and appellant's assignment must be denied.

*Penal Statute: Action Against Director General.*

II.   Appellant insists that the trial court erred in submitting the case to the jury upon the humanitarian, or last chance, rule or doctrine. It is contended by appellant that plaintiff is bound by his own sworn testi-

mony, which is to the effect that he passed the wagon driven by the witness Friend some seventy-five or one hundred yards from the crossing, at which time he was traveling fifteen or twenty miles an hour; that, immediately on passing this wagon, he began reducing the speed of his automobile until, when about the right-of-way fence fifty feet from the track, he was traveling only four or five miles an hour; that he continued to reduce the speed of the automobile until, when within twenty-five feet of the track, he was traveling only about three miles per hour, so slow in fact that it was necessary for him to shift from high to intermediate gear to keep from "killing the engine" and stopping right there; that had he seen the train at that time he could have stopped almost instantly. There is another element of plaintiff's evidence, however, which appellant seemingly overlooks and that is, that when plaintiff shifted gears, the speed of the automobile was somewhat increased.

*Humanitarian Rule: Recovery on Strength of Defendant's Evidence.*

"Q. Had you given the car more gas at that time? A. Yes, sir.

"Q. Were you going six miles an hour or seven? A. Possibly might have been; I don't know whether it picked up that much speed or not."

Assuming plaintiff's testimony to be true and insisting that the court cannot disregard it as untrue or unworthy of belief, appellant argues therefrom that the operatives of the train, and especially the locomotive fireman, had the right to assume and believe that plaintiff was slowing down the speed of the automobile with the intention of stopping, and would stop before reaching the danger zone, without attempting to cross the railroad track in front of the approaching train. In other words, appellant urges that, in order to recover under the humanitarian doctrine, plaintiff must show a state of facts which would lead a reasonably prudent person in the position of the fireman to believe from his action, or the action of his automobile, that he was in a place

of peril and oblivious of his danger; and, furthermore, that plaintiff, according to his sworn testimony was doing the very thing which a man ordinarily does when he sees a train and is going to stop to let it pass.

The defendant's evidence respecting plaintiff's actions at the time and the speed of the automobile, however, is utterly at variance and in direct conflict with plaintiff's own testimony thereon. The fireman testified:

"Q. Did you see this automobile as it approached the track? A. Well, I seen it a little ways back of the track, yes.

"Q. Where were you when you first saw it; how far was the engine back from the crossing when you first saw the automobile? A. Possibly one hundred feet, or one hundred fifty feet, somewhere in that neighborhood.

"Q. Where was the automobile then? A. Well, I don't know; it was probably back about one hundred feet or such a matter when I first noticed it.

"Q. Can you estimate the speed at which the automobile was coming? A. About twenty miles an hour, I judge.

"Q. *Was there anything that indicated to you whether or not the driver of that automobile would stop that automobile before it got to the track?* A. *He never slowed up any or anything.*

"Q. *He didn't slow up any?* A. *No.*

"Q. How close was you to the road crossing when it occurred to you—when you formed your impression, if you did form an impression, that the automobile was not going to stop? A. Somewhere about one hundred feet from the crossing.

"Q. Now, where was the automobile then when you formed that impression? A. Well, I don't know. He got a little closer than he was at first; I don't know how far back he was.

"Q. Had he reduced his speed then? A. Not that I noticed.

"Q. Had he reached the right-of-way fence? A. I don't believe he had.

"Q. Tell the jury in feet, if you can, about how far he was from the track, east of the track, when it occurred to you he was not going to stop? A. Oh, he was between seventy-five and one hundred feet, I guess, back from the track.

"Q. And at what speed was he running the automobile at that time? A. About twenty miles an hour.

"Q. You was down about three hundred feet when you saw him, was you not? A. I don't know. Maybe it was about three hundred feet; I don't know how far it was.

"Q. You did extend your vision out there and you did actually see the automobile? A. I seen the automobile when he drove around the wagon.

"Q. You were then about three hundred feet north? A. I don't know how far I was north."

Defendant's conductor testified: "The automobile was running, when I first saw it, between fifteen and twenty miles per hour, I should judge. *The speed of the automobile was not changed any after I first saw it,* not from the time it passed the wagon until it went in front of the engine. I was out there yesterday and stepped off to where I am positive this wagon was standing and it is at least two hundred feet. The first time that that crossing comes in view on that train going south is about four hundred feet back from the crossing. I was in as good a position to see as the engineer or the fireman. When we were about four hundred feet north of the crossing, travelers on the east side of the crossing come under the eye of the fireman and myself. At about that point I saw the automobile go around a wagon. The wagon was standing still. I was out there yesterday and I am very positive the wagon was setting two hundred feet from the crossing. At the time I saw this automobile it was traveling fifteen to twenty miles an hour. And I was interested to see

whether or not it was going to escape injury and I was then about four hundred feet from the crossing. I noticed the brakes applying in emergency on the train about one hundred feet, I would judge, from the crossing. *When I was in 400 feet, I could see, if that automobile kept traveling at the rate of speed it was traveling, it would probably come in contact with the engine on the track.* I saw him and was watching him when he was 150 feet away from the track; he was then running at fifteen or twenty miles an hour, I judge. *I was watching to see whether or not he would slack down. I did not think that, if he kept going as fast as he was, he would get over the track before our engine got there. I had my own mind made up if he went in front of that engine he would get hit if he kept on going at the rate of speed he was going.*"

Defendant's witness Friend testified: "My best knowledge is the automobile was going about something like twenty miles an hour when it passed me. The automobile continued on west toward the crossing. *The speed of the automobile was not reduced or lessened at any time* after it passed my horse and me until the automobile was struck. *I never seen any action of being slowed up at all.* It was right there in front of me all the time. *The automobile seemed to travel at about the same rate of speed as it went on down there.*" (Italics ours.)

The majority of the Springfield Court of Appeals, in their opinion in the instant case (251 S. W. l. c. 89, 90), conclude: "Plaintiff's evidence, if it is true, precludes a recovery. But, it is argued that plaintiff is entitled to the benefit of defendant's evidence if it helps him to make out a case. Ordinarily that is true; but the writer of this opinion is of the belief that it has never been held in Missouri, and never should be held to be the law, that, where plaintiff goes on the stand, under oath, and testifies to a given state of facts which are material to a recovery, he then can not [can] turn to the court and to the jury and say, 'I am entitled to a ver-

dict under the defendant's testimony, although per-
chance that testimony actually contradicts what I have
testified were the facts of the case.' . . . But,
above all, we are of the opinion, that, when the plaintiff's
testimony described a state of facts which denies a re-
covery under the humanitarian doctrine, he cannot then
turn to the defendant's testimony, which contradicts
his testimony, and undertake to build a case upon that.''
We think, however, that the fallacy of the reason-
ing and conclusion of the learned writer of that opinion
become instantly apparent when it is clearly evident
(as here) from the testimony of defendant's employees,
who are charged with the duty of using due care and
for whose negligence, if any, defendant is liable, that
their own actions and conduct at the time were not in the
slightest degree affected by, or predicated upon, what
plaintiff himself says his own actions were at the same
time.   Clearly, according to the testimony of the fire-
man and conductor of the train, they did not rely upon
the fact that plaintiff was steadily decreasing the speed
of his automobile down to four or five miles an hour at
the east right-of-way fence, and then to three or four
miles an hour when within twenty-five feet of the track,
with the apparent intention of stopping before reaching
the danger zone, for both of them testified quite posi-
tively that, at the time they first saw the automobile, it
was running at a speed of fifteen to twenty miles an hour
and that neither was the speed of the automobile de-
creased at any time before the collision, nor did plain-
tiff give any indication whatever of slowing down or
stopping the automobile.   They are corroborated in
their testimony on that phase by defendant's witness
Friend.   It occurs to us that defendant, had he seen fit
to do so, might have elected to stand upon his demurrer
to the evidence offered at the close of plaintiff's case-in-
chief, but, having elected to offer evidence, which evi-
dence conclusively shows that defendant's employees did
not rely upon the actions of plaintiff as related in plain-
tiff's own testimony, defendant then took the chance of

aiding plaintiff's case by that evidence.    [Stauffer v. Railway Co., 243 Mo. 305.] Therefore, in ruling the applicability of the humanitarian rule to all the facts and circumstances in evidence, it would seem to us that plaintiff should be entitled to the benefit of those facts and circumstances upon which defendant, or his employee acting for him and in his stead, says he relied and acted at the time. If defendant's witnesses had testified that they relied and acted upon the same facts and circumstances related by plaintiff, himself, then plaintiff might not, and should not, be permitted to deny his own version of the facts; but that is not this case.

Appellant cites Behen v. Transit Co., 186 Mo. 430; Graefe v. Transit Co., 224 Mo. 232; and Steele v. Railway Co., 265 Mo. 97, which cases are the basis and foundation of the majority opinion of the Court of Appeals in the instant case, as authority for the contention that plaintiff will not be permitted to repudiate his own testimony, which, if true, disproves his own case, and recover on defendant's evidence. The facts in those cited cases differ largely from those in the instant case and in none of the cited cases were we confronted with the same or similar state of facts and the exact proposition of law with which we are confronted in the instant case.

The precise question seems to have been recently before this court in Zumwalt v. Railroad Co., 266 S. W. 717, and this division of this court in effect, at least, ruled the point against the defendant railroad. In that case, the appellant railroad likewise cited the same cases now cited and relied upon by the appellant in the instant case. The appellant in that case also cited and quoted copiously from the majority opinion of the Springfield Court of Appeals in the instant case in support of its contention that plaintiff was conclusively bound by his own testimony and could not look to the testimony of defendant's fireman to aid him in his case upon the humanitarian rule. In Zumwalt's case, the plaintiff was driving a Ford sedan automobile, which was struck by defendant's railroad passenger train on a public crossing just outside

the corporate limits of Independence in Jackson County. Plaintiff in that case, as disclosed by our opinion, testified unequivocally that, as he approached the railroad right-of-way, he looked and listened; that there was no train coming and no whistle sounded or bell rung; that he could not see to the east (from whence the train came) as he approached the right-of-way, on account of some trees and shrubbery; that he first saw the train when he was on the track; that he threw his car out of gear when about eight or ten feet inside of the right-of-way and had his foot on the brake at that time; he then looked and listened for the train; that his car did not come to a dead stop, but almost, just barely moving; at that time he could see east along the track from seven hundred to one thousand feet, and he was then about forty feet from the track; before he came to a clear stop he started his car up again, pushed it back in low gear and started up to the crossing; he was going up grade and had to go in low gear all the time; going this forty feet, his speed was about three or four miles an hour; when he hit the first rail his car "kind of stopped," slowed down a little, and he had to put on more gas to get over the rail; when he first saw the train, his front wheels were over the first rail and the train was about 100 or 150 feet away from him (coming from the east), and running about thirty or thirty-five miles an hour; he then tried to go on over the tracks, put on more gas, accelerated his speed a little, but the train struck his automobile about the center. The locomotive fireman, who was the only other eye-witness, testified in that case that, as he approached the crossing, he saw an automobile approaching the track, going approximately about fifteen miles an hour; could not see the face of the person in the automobile; did not observe the automobile check its speed until it went on the track; when he first saw the automobile, the train was about one hundred feet east of the crossing, and he then holloed to the engineer to stop and the engineer applied the emergency brake; the automobile was thirty-five feet south of the track when he

first saw it, between thirty-five and fifty feet; his view down the half mile of track was unobstructed; when he holloed to the engineer to stop, the automobile was around thirty-five feet from the crossing; when he first saw the automobile, he did not know there was going to be a collision, but he holloed to the engineer to stop; he had no way of knowing what the man driving the car would do; plaintiff was driving straight north up onto that crossing; right into the path of his train; he was coming about fifteen miles an hour and was not slowing up; it took witness a second or two to realize that this car was going to come on; the instant he realized that, he holloed to the engineer.; it is nothing unusual to see anybody drive up close to the track and stop; he had no way of knowing that plaintiff was going to attempt to cross ahead of the train; the reason he holloed to the engineer to stop was because he saw this automobile approaching the track, coming into the path of the train; and that he assumed a man approaching an open crossing like that will look and see the train, where it is in plain view, and stop. In ruling the question before this division of this court in Zumwalt's case, we said (266 S. W. l. c. 724, 725): "As to the demurrers to the evidence: We think they were properly denied. In passing on such demurrers the law required the court to give the plaintiff the most favorable view of the most favorable testimony in the whole case, that of defendants as well as plaintiff. [Maginnis v. Railroad, 268 Mo. 667.] Plaintiff testified that he was riding on the left side of the automobile, and was moving in low gear at three or four miles an hour, after he had almost stopped at a point forty feet south of the track. The fireman says he could not see plaintiff, but he first saw plaintiff's automobile when forty or fifty feet south of the track, and he watched him all the time until the collision. If so, and plaintiff's testimony is true, and that was for the jury, there was evidence that he saw that plaintiff had almost stopped and started up again, proceeding slowly, without checking up, at three or four miles an hour un-

til the collision occurred. The fireman also testified that plaintiff gave no indication that he was going to stop before he reached the crossing. That he saw, when he first observed plaintiff forty or fifty feet from the crossing, that a collision was inevitable, and that the train was bound to hit plaintiff. That he 'hollered' to the engineer to stop, did not tell him to sound the whistle, although he had frequently told engineers to whistle in such emergencies, and knew it was too late to stop. Plaintiff's evidence also is he looked and listened both ways as he approached the crossing, and did not see or hear a train coming from either direction. . . . While we think this testimony conclusively shows that plaintiff was guilty of contributory negligence, it does not show conclusively as a matter of law that he actually saw the approaching train when he looked. To have actually seen the train coming so close to him as it must have been when he says he looked east, forty feet south of the tracks, and then proceeded to cross its pathway, as the evidence shows he did, would have been an attempt to commit suicide. This will not be presumed. [Parker v. Ins. Co., 289 Mo. 42, and cases cited.] But the just inference rather is that he looked so carelessly or hastily as to amount to not looking, and therefore did not see the train. [Hale v. St. Joseph Light Co., 287 Mo. 499.] . . . It is also said that the fireman did not realize, and by due care could not realize, that plaintiff was not going to stop before going upon the track. That drivers of automobiles frequently drove up very close to the track and then stopped in safety, and the fireman on this occasion had a right to presume plaintiff would do so. But the answer to this contention is that the fireman says he knew there was going to be a collision when he first saw plaintiff forty or fifty feet south of the track. And, if plaintiff's testimony is true, he must have seen plaintiff when he was almost stopped and then started ahead again, which would indicate to a reasonable person, at least it would be for the jury to say, that plaintiff had satisfied himself that all was safe

for him to proceed over the crossing—that no train was coming. The fireman also says he told the engineer to stop as soon as he saw plaintiff. So that there is circumstantial, as well as direct, evidence that the fireman realized plaintiff was not going to stop from the moment he first saw him forty feet south of the track. . . . It is true the fireman told the engineer to stop and did not tell him to blow the whistle, but as the fireman says he knew there was not time enough to stop, it was for the jury to say whether he should not have told the engineer to blow the emergency whistle, which might have saved plaintiff from injury, as he testifies he could have stopped his automobile in two or three feet had he known of his danger. At least this presented a question for the jury. . . . In our judgment there was a case for the jury under the humanity doctrine, under which the case was submitted, for failure of the fireman to notify the engineer to sound the emergency whistle, and defendants' demurrers were not well taken.''

The instant case and Zumwalt's case are so closely akin in their respective facts and surrounding circumstances, we think that the question of whether the case at bar was rightly submitted to the jury upon the humanitarian doctrine must be ruled in accordance with our recent ruling in Zumwalt's case. In the instant case, as in Zumwalt's case, the testimony of plaintiff and that of the fireman was conflicting, and the testimony of the fireman, as in Zumwalt's case, shows that the fireman did not rely upon what plaintiff says his own actions were at the time. Besides, as we said in Zumwalt's case, if plaintiff's testimony is true in the instant case, and that was for the jury to say, then there was evidence that the fireman saw that plaintiff had almost stopped before entering the danger zone and then started ahead again at a slightly accelerated speed, thereby indicating to a reasonably prudent person that plaintiff had satisfied himself that it was safe for him to proceed over the crossing under the belief that no train was approaching. The evidence shows that plaintiff's automobile had al-

most cleared the track when the locomotive struck the rear right wheel of the automobile, for, as defendant's engineer testified, "if it had been a foot farther I would have missed him." In other words, the evidence justifies the presumption on our part that in one second of time —aye, even in a fractional part of a second—the automobile would have cleared the track in safety.

The witness Friend testified: "When I saw the train come in sight around the curve there the automobile was close approaching the track. As far back as the right-of-way fence, something about that distance. From where I was back one hundred or one hundred fifty feet from the track, I first saw the train when it was about that distance, about three hundred feet, I guess, between two hundred and three hundred feet up the track when I first seen it approaching around the curve. That was after it came around the little hill." The engineer testified that the whistle was blown about six hundred feet north of the crossing and the next signal or whistle was not given until after he got a signal from the fireman to stop, when the locomotive was between seventy-five and one hundred feet from the road; that he did not slacken the speed of the train until the fireman called to him to stop and that, within the space of one hundred feet, the speed of the train could have been reduced about ten miles an hour and, by reversing the engine, the train could have been stopped in two hundred feet. According to defendant's evidence, the train approached the crossing at a speed of twenty-five miles an hour, or $36\frac{2}{3}$ feet a second. If, according to plaintiff's testimony, the automobile was traveling four miles an hour after passing the right-of-way fence fifty feet from the track, it was traveling slightly less than six feet a second, and if traveling three miles per hour, it was covering 4.4 feet a second. On the other hand, if the automobile was traveling fifteen miles per hour between the right-of-way fence and the railroad track, according to defendant's witnesses, then it was covering twenty-two feet a second, and if traveling twenty miles per hour, it was covering

slightly more than twenty-nine feet a second. Under the fireman's testimony, which was corroborated to some extent by the testimony of the conductor and the witness Friend, he watched the automobile approach at least some distance nearer to the track after he first observed the automobile running toward the track without diminution of its speed or sign of stopping, before apprising the engineer of the danger of a collision or the approach of the automobile. In that interim the train was approaching the crossing at the speed of 36⅔ feet a second. If the fireman, therefore, had called out to the engineer when he first observed the automobile approaching the track without any diminution in its speed and without any indication that it would be stopped before crossing the track (as the testimony of both fireman and conductor indicates), the speed of the train could have been sufficiently slackened to have permitted the automobile to have crossed in safety, or an emergency whistle might have been sounded in time to have warned plaintiff of his peril and to have enabled him to have stopped his automobile before reaching the danger zone. At least, we believe these were proper questions for the jury under all the evidence and the existing circumstances in the case.

In a case recently decided by Division Two of this court, Allen v. Chicago, Burlington & Quincy Railroad Co., 313 Mo. 42, it is said, referring to the sounding of an emergency whistle in addition to the statutory signal by bell or whistle required to be given by Section 9943, Revised Statutes 1919: "The above statute became the law in the early history of the State, and under *ordinary* circumstances was deemed adequate to protect the public from danger in using these crossings. We cannot shut our eyes to the fact that new and dangerous conditions have arisen in the extended use of motor vehicles, which now make these crossings, both in the cities and country, extremely dangerous, as shown by the appalling death toll recorded in the metropolitan press of our land. We

should likewise take judicial notice that, under the improved conditions of our highways, the motor vehicle travel will continue to be *extended,* and that the lives of many helpless women and children will be constantly at stake in passing over these highway crossings. Is it therefore unreasonable to require at the hands of the railway, without additional expense, and little trouble, when the exigencies of the occasion require it, that its engineer shall use all the means at hand to warn those about to pass over the crossings of the approach of the train, in order that travelers may stop in a place of safety? . . . In Hinzeman v. Railroad, 199 Mo. l. c. 65, LAMM, J., in clear and forceful language, speaking for our court en banc, said: 'The whistle was there, in going order, and could be blown instantly. The blowing of a locomotive whistle is the ordinary and usual means of giving a sharp alarm, the steam was there to blow it, the lever was there to operate it, and the man was there to pull the lever and open the throttle. Is it an unreasonable and unfair requirement, then, as a matter of law, if it be held that the whistle should be used if possible, when life is at stake? We think not. The monotonous stroke of a bell may be one thing; the incisive, ear-splitting scream of a whistle, a signal known to man and beast as performing the office of an "alarm signal," is another.' "

We therefore conclude that no error was committed by the trial court in submitting the case to the jury under the last-chance or humanitarian rule.

Appellant claims, however, that the petition does not state a cause of action under the humanitarian doctrine because it does not allege that plaintiff, or his wife, was oblivious of the danger and that his, or their, obliviousness was, or by the exercise of ordinary care could have been, apparent to the servants of defendant. This contention must be ruled against appellant under our recent holding, in Banc, in Banks v. Morris & Co., 302 Mo. 254, in which case we ruled that obliviousness is but a subsidiary or evidentiary fact, the perilous situation of plaintiff, and defendant's knowledge thereof, being the

ultimate, issuable fact to be pleaded. That ultimate fact is well pleaded in the petition now before us.

III. Appellant insists that the evidence shows that plaintiff was guilty of contributory negligence as a matter of law and, hence, that the case should not have been submitted to the jury upon the issue of primary negligence of defendant in failing to give the statutory warning by whistle or bell. The Court of Appeals, in their opinion in the instant case, ruled that plaintiff was guilty of contributory negligence as a matter of law. Respondent, on the other hand, insists that, since his petition was grounded on both primary negligence and the humanitarian rule, and evidence was offered on both those issues, and inasmuch as defendant's general demurrer to all the evidence challenged the whole case and was overruled *nisi*, whereupon defendant then asked certain instructions upon the theory of primary negligence, and other and separate instructions upon the theory of negligence under the humanitarian rule, by so doing defendant waived the right to have the question of plaintiff's contributory negligence considered by this court as a matter of law. Respondent relies upon our rulings in Torrance v. Pryor, 210 S. W. 430, and Davison v. Hines, 246 S. W. 295.

*Contributory Negligence: General Demurrer: Waiver.*

In Torrance v. Pryor, supra, we said (l. c. 432, 433): "The demurrer to the evidence [in the nature of an instruction] was a general one, and not specifically directed to the humanitarian theory of the case. It reads: 'The court instructs the jury that under the pleadings and all the evidence in this cause your verdict must be for the defendants.' But the defendant did not, by this demurrer, seek to separate the wheat from the chaff. This demurrer placed it up to the trial court to say whether or not a case had been made upon any theory within the purview of the pleadings. The court said that there had been a case made, but of course did not specify the theory upon which it deemed the evidence sufficient to make a case. So far as we are advised, it might have

been upon the humanitarian theory, or it might have been upon what we have denominated primary negligence upon the part of the defendant. Under this status of the case, the defendant asked and was given an instruction upon the humanitarian rule. The question is: Should it be ruled that the defendant is now estopped from denying that this theory was in the case? Had the demurrer been a specific one, challenging the sufficiency of the evidence under this particular theory of the case, such demurrer could be urged here. This, for the reason that, after defendant has made his point clear, he is not estopped by the theory contained in his other instructions, which theory is forced upon him by the action of the court. . . . Here the demurrer challenged the whole case, and the evidence upon all of the several alleged grounds of negligence. In overruling such a demurrer, the court does not indicate its theory upon any particular ground of negligence. In such case, it is sufficient for the trial court to find (in his own mind) that the evidence does sustain one or more of the alleged grounds of negligence. Nor does such a general demurrer call upon the court to indicate the ground in mind. So that, when this general demurrer was overruled in this case, the defendant was in no position to say that the court, in overruling it, has said that violation of the humanitarian rule is in the case, and the defendant thereby authorized to ask instructions thereon per force of the ruling of the court. Under the status we have in this case, we should, and do, rule that defendant, having asked and received an instruction upon the humanitarian doctrine, cannot now plead error upon the part of the trial court in giving one for plaintiff on the same theory. Had the demurrer to the evidence specifically challenged the sufficiency of the evidence upon this point, then we would have a different rule."

In the instant case, evidence was offered by plaintiff upon the theory of primary negligence and also upon the theory of negligence under the humanitarian rule, and defendant offered at the close of all the evidence, the

314 Mo. Sup.—36.

following instruction in the nature of a general demurrer: "The court instructs the jury that under the pleadings and all the evidence in the case, the plaintiff is not entitled to recover in this action and your verdict will be for the defendant." This instruction was refused. Thereupon defendant offered Instructions B and C, both of which were refused. Instruction B was clearly founded upon the humanitarian theory of the case and had nothing to do with the theory of primary negligence. Instruction C, refused, reads: "The court instructs the jury that you must not in arriving at your verdict consider as negligence on the part of defendant the failure, if any, to sound the whistle when eighty rods from the crossing, and sound it at intervals until the crossing was passed, or the failure, if any, to ring the bell continuously from a point eighty rods from the crossing until the crossing was passed." By that instruction defendant did not ask the trial court to withdraw from the jury the consideration of plaintiff's contributory negligence as a question of fact, and no other instruction was asked by defendant withdrawing the question of plaintiff's contributory negligence from the jury or requesting the trial court to declare that plaintiff was contributorily negligent as a matter of law. The evidence was conflicting whether the statutory warning signal was given by whistle or bell and, in view of that conflict of evidence, defendant's requested Instruction C was rightly refused. It might also have well been refused, we think, upon the humanitarian theory, which was predicated upon defendant's failure to give plaintiff and the deceased timely warning of their peril and danger. Thereupon the defendant requested, and the court gave, defendant's Instruction M, as follows: "The court instructs the jury that the defendant was not required to both blow the whistle and ring the bell as the train approached the crossing in question and if you find and believe from the evidence that either signal was given at the place and in the manner as is set forth in other instructions, or *if you find that neither of said signals were so given but*

*further find that the plaintiff saw, or by the exercise of ordinary care could have seen the train in time, by the exercise of ordinary care, to have stopped his automobile in a place of safety before reaching the track, then you are instructed that the plaintiff cannot recover on his allegation of negligence, to-wit, the failure of the defendant to give one or the other of such signals."* (Italics ours.)   Clearly, by the italicized part of said instruction, defendant asked the jury to pass upon the question whether plaintiff saw, or, by the exercise of ordinary care, could have seen the train in time, by the exercise of ordinary care, to have stopped his automobile in a place of safety before reaching the track; in other words, it submitted to the jury the matter of plaintiff's contributory negligence as a question of fact.   Plaintiff's Instruction One, complained of by appellant, submitted the issue of defendant's primary negligence in failing to give the statutory warning signal by whistle or bell and furthermore required the jury to find that plaintiff was exercising ordinary care for the safety of himself and his wife. If plaintiff's instruction was erroneous in submitting to the jury the question of ordinary care on plaintiff's part as a question of fact, then it would appear that defendant's Instruction M is subject to the same vice, and that defendant invited, or at least participated in, the error, if any there be.   At least, defendant did not, by any requested instruction or demurrer, ask to have the matter of plaintiff's contributory negligence withdrawn from the jury or ask the court to declare that plaintiff was guilty of contributory negligence as a matter of law, and, having seen fit to submit that matter as one of fact to the jury, by his own requested and given instruction upon the issue of primary negligence, he cannot now assign error of the trial court in giving one for plaintiff on the same theory, and is therefore estopped to complain of the submission of that question to the jury.   Such was the holding of this court in Torrance v. Pryor, supra, and we see nothing to distinguish the instant case from the Torrance case.

IV.   Appellant assigns error in the admission and exclusion of certain evidence, which it is claimed was prejudicial to appellant.   The trial court, over defendant's objections, admitted the testimony of certain witnesses for plaintiff as to the position and physical condition of the three occupants of the automobile immediately after the collision.   Defendant asked that such

Conditions after Accident.

evidence be stricken out and the jury discharged from further consideration of the case.   The place where the occupants of the automobile were thrown, the demolished condition of the automobile, the side of the track on which they were thrown and their distance from the track and their physical condition when found immediately after the collision, tended to prove to some extent, at least, the force of the collision, the speed at which the train was traveling, the part of the automobile which was struck by the train, and that the automobile had almost cleared the track at the time of the collision.   Such circumstances certainly had some evidentiary bearing upon the relative speeds and positions of the train and automobile at the time of collision, and hence were circumstances bearing upon the issues before the jury.   Besides, a careful examination of the evidence complained of convinces us that its admission had no harmful or prejudicial effect on the consideration of the merits of the action by the jury, nor did it warrant the trial court in discharging the jury. [Sec. 1513, R. S. 1919; O'Neill v. Kansas City, 178 Mo. 91.]

Defendant's conductor was asked: "Q.   From your experience in running as conductor or otherwise, have you observed a custom or ordinary action of automobiles in approaching tracks as to how near they ordinarily approach before they stop?" and also, "Q.   Automobiles ordinarily approaching railroad crossings situated as this and running at about the speed this was running when you first saw it, what would *you say about the ordinary custom* or practice as to when an automobile under such conditions begins to slacken its speed or how

Anderson v. Davis.

close it ordinarily approaches before stopping?'' Plaintiff's objections to these questions were sustained, whereupon defendant offered to show by the witness that *"he has observed* the action of automobiles in a great many cases and under similar circumstances, and that ordinarily said automobiles do not reduce their speed or show any indication of intention to stop until they get within less than fifty feet of the crossing.'' The offer of proof was likewise refused and exceptions saved. We think that the trial court committed no error in sustaining plaintiff's objections to those questions and in excluding the offer of proof. The latter question was objectionable, in the form it was asked, in that it did not ask *what the custom was,* but asked what the *witness* had to *say* about the custom. What the witness had to *say* about the custom does not establish the fact that there is a custom. ''The existence of a custom cannot be proved by the opinions of witnesses that it ought to exist, but must be proved as a fact. Evidence introduced to establish a general custom, which consists of individual opinions and the obligation which the witnesses should have deemed resting upon them under the circumstances in the case, is inadmissible.'' [27 R. C. L. 197.] The questions asked were also too vague and indefinite in their scope. The speed and nearness with which automobiles ordinarily approach a railroad track before stopping depend largely upon the temerity of the individual driver, the obscurity of his view and the power of his automobile, all of which elements are lacking in the questions propounded and which, we think, might have some bearing upon the custom, if any there be. Plaintiff's counsel, furthermore, objected to the questions because the duty of the operatives of the train, and the care to be observed by them at the time, is fixed by statute and positive rules of law and that no custom can control that duty. We have serious doubt whether a general custom, if established, will control, in any degree, the duty imposed upon the railroad operatives by statute or positive rule of law. As said by WOODSON, J., speaking for this

court, in Frese v. Railroad Co., 290 Mo. l. c. 515: "More-over, in my opinion, the existence of such a custom, if it existed, could not have the effect to abrogate the statute mentioned."

V. Appellant assigns error in the refusal of his requested Instruction G, as follows: "The court instructs the jury that if you find from the preponderance of the evidence that the plaintiff, William H. Anderson, was not oblivious to his danger, then you are instructed that the engineer and fireman were under no duty to attempt to stop or reduce the speed of the train." Plaintiffs' Instruction 2, which was predicated upon the humanitarian rule, required the jury to "find and believe from the evidence that the agents and servants of defendant in charge of and operating said locomotive in approaching said crossing at said time and place, saw, or by the exercise of ordinary care could have seen plaintiff and his said wife in said automobile so approaching and attempting to pass over said crossing and *oblivious to said danger (if you so find)*." The jury being required to find, under plaintiff's Instruction 2 that plaintiff and his wife were oblivious to the danger, we see no harmful or prejudicial error in the refusal of the converse of that instruction requested by defendant. Furthermore, defendant's given Instruction K, upon the humanitarian theory of the case, required the jury to find and believe "that the plaintiff was oblivious to his danger."

Appellant complains of the refusal of his requested Instruction E, as follows: "The court instructs the jury that if you find the issues for the plaintiff you must not, in arriving at your verdict, allow plaintiff any sum as compensation for the loss of society or companionship of his deceased wife, or to compensate him for his pecuniary loss as the result of her death." Plaintiff offered no evidence of damage or pecuniary loss. The jury were instructed, in plaintiff's Instruction Five: "If you find the issues for the plaintiff, you will assess the

penalty against the defendant in the sum of not less than two thousand dollars and not exceeding ten thousand dollars, in the discretion of the jury.'' Plaintiff's instruction comports with the statute (Sec. 4217, R. S. 1919) and our construction thereof by Court en Banc, in Grier v. Railway Co., 286 Mo. 523. Plaintiff's instruction was clear and in the exact language of the statute, and no error was committed in the refusal of defendant's Instruction E.

It follows that the judgment *nisi* must be affirmed, and it is so ordered. *Lindsay, C.,* concurs.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur.