Anna Jones, Administratrix of Estate of George W. Jones, v. St. Louis-San Francisco Railway Company, Appellant.—30 S. W. (2d) 481.

Division One, July 9, 1930.

*E. T. Miller, A. P. Stewart* and *C. H. Skinker, Jr.,* for appellant.

*Watson & Allison, Lorts & Breuer* and *Barton & Moberly* for respondent.

ELLISON, C.—Action under the Federal Employers' Liability Act (45 U. S. C. A., secs. 51-59) for damages caused by the negligent killing of the plaintiff's intestate while he was employed as a switchman making up an interstate train in the defendant's switch yards at the city of St. Louis. From an adverse verdict and judgment for $10,000 the defendant has appealed.

The negligence charged in the petition is that the agents and servants of the appellant carelessly ran a locomotive and train of cars against the deceased while he was standing at the end of a freight car in the performance of his duties trying to adjust a coupler; that the movement was made with great force and violence at the unusual speed of fifteen miles per hour, and without signal or warning; that appellant had negligently failed to prescribe any rules, signals or system for the orderly switching of cars in the yard; that the deceased was unaware of the approach of the cars that killed him and had given no signal for them to be switched toward him. The petition does not plead any custom to give warning signals and a violation thereof. The answer was a general denial coupled with a plea of contributory negligence and assumption of risk.

The evidence was that in the appellant's switch yard a connecting or lead track ran in a northerly and southerly direction. From it some fifteen parallel tracks led off to the west on a slightly descending grade. About seven o'clock in the evening of December 26, 1925, a crew was engaged in switching operations on these tracks. Certain cars were standing on track 9. Another car was shunted to that track. It moved westward about five car-lengths from the lead track, but stopped some distance short of the cars already there, and of course did not couple with them. About ten minutes later still another car was run in on track 9 by a flying switch. It rolled until it struck the standing car, and the latter, moving forward from the impact, ran over the deceased, who must have been at or beyond the west end thereof. Both legs were cut off just below the knee. He died a few minutes later, unable to give an account of how the accident had occurred.

Just what the deceased was doing when injured is not definitely known. It was dark and the other members of the crew did not see him. One of his duties was to set the brakes on cars left standing, and to scotch the wheels when he thought that necessary to keep them from rolling out of place on the sloping track. Respondent says he may have been doing this latter. Also, from the fact that he was a field switchman and is shown to have cut the cars in the last preceding switching movement on track 9, she thinks the inference is warranted that it was his duty to look after the coupling devices and that he was adjusting the coupler on the standing car when struck—although no further movement of that car was then contemplated. Either of these operations would have taken him to the west end of the standing car, and respondent argues it is immaterial which he was doing or what he was doing, so long as he was killed in the performance of his duties in making up an interstate train.

The weather was windy and cold, zero or below. At such times the grease and waste in the axle boxes of cars is stiff and may be frozen. The locomotive engineer and one of the switch crew, both of whom testified as witnesses for respondent, said this necessitated greater force and speed in switching movements. They estimated the second car was moving about fifteen miles per hour when it left the engine and said that was not an unusual speed under the conditions. There was no evidence to the contrary unless a conflicting inference be drawn from the physical results of the collision, and from the fact that another witness for the respondent, while admitting the wheels were harder to turn in cold weather, also said they would move freely after a few revolutions.

As to the physical facts. After the collision the west end of the standing car came to a stop about 55 feet west of where the deceased was found, and the latter point was 26 feet west of where

he had been struck, as shown by blood and flesh on the rail. So the car must have moved 81 feet from the force of the impact . if deceased was run over at the instant of the collision by the west end of the car (where respondent's theory puts him). But the engineer and switchman estimated the standing car was five or six car-lengths (200 to 240 feet) west of the lead track before the collision, and later the first blood spots were found to be 311 feet west of the lead-track switch point. From this the respondent argues the deceased must have been dragged about 100 feet before being actually run over, which would indicate the collision was all the more violent. But this is conjectural and based on the assumption that the standing car was originally only 200 to 240 feet west of the switch point, whereas the trainmen's estimate was approximate and probably not very accurate in view of the weather conditions, and the fact that the car passed out of their sight in the darkness.

In the statement of facts in the respondent's brief she calls attention to the following testimony concerning the practice (or lack of it) of giving signals during switching operations. ''Engineer Story testified: 'At times we ring the bell and sound the whistle in making these switching movements in the yards. If we are pulling out on the lead and we see somebody coming close to the track we ring the bell. If a man steps up to the engine and gives a signal we ring the bell. We do this when there is danger. In switching cars we don't ring the bell or whistle *every time.*' It is admitted by all that no warning of any kind was given as to the movement in question.''

The deceased was fifty-eight years old and had been working for the appellant company for three years prior to his death. For twelve years he had been a brakeman and conductor on the Missouri Pacific railroad. Another time he had been a brakeman on the appellant's road for about four years, two months during which period he worked as a switchman in the yards for a few months. This made nineteen years of railroad experience. Just how much of that time he had been employed as a switchman is not clearly shown, but there is no intimation in the pleadings or evidence that he was not familiar with the work and the yard.

I. The appellant contends the evidence wholly fails to show the deceased was engaged in interstate commerce when he was injured and killed—that there is no proof as to what he was doing, or disclosing the train movements at that time had any connection with interstate commerce. But there was evidence indicating the yard was exclusively used for making up eastbound interstate trains and that the switch crew that evening was working on eastbound traffic. So we resolve this first

assignment in respondent's favor without inquiring into it closely, and pass to another.

II. Appellant urges the deceased must be conclusively held to have assumed the risk of injury in the manner in which he was injured; and under the Federal cases we think the contention should be sustained. On that point the respondent says in her brief: "Deceased probably knew of and therefore assumed the dangers incident to the darkness, the wind and the weather, but he did not know of and therefore did not assume the dangers caused by the *omission of the usual warnings,* and the *tremendous force* with which one car was shunted against the other causing his death." (Italics ours.)

By the word "warnings" as used in the above quotation the respondent evidently means warning signals by bell or whistle, for at the trial her sole complaint on that score was of the failure to give these engine alarms; and as to signals by the waving of a lantern the uncontradicted testimony was that the duty devolved alone on the switch foreman to give them in controlling the switching operations and that he did so on the occasion of deceased's injury. No whistle was blown or bell rung and the appellant had no rule requiring it. That is conceded.

The general Federal rule is that a railroad company rests under no duty to employees working in its yards to sound bell or whistle on switch engines moving thereabout. An employee takes upon himself the hazard involved in going on or near tracks where he knows cars are likely to be shunted without warning. But an exception to the rule is allowed when the switching movement was covered by a rule or custom to give warning signals for the protection of employees of the class involved and the employee was working in the line of his duty. [O'Donnell v. B. & O. Rd. Co., 324 Mo. 1097, 1107, 26 S. W. (2d) 929, 933; Martin v. Wabash Ry. Co., *ante,* page 1107, 20 S. W. (2d) 735.]

So in this case if the respondent had pleaded and proved a custom observed for the benefit of switchmen to give warning signals by bell or whistle when cars were shunted, she would perhaps have been entitled to recover so far as that one fact is concerned. But no such custom was pleaded or proven. On the contrary, one of the grounds of negligence charged in her petition was the failure of the appellant company to provide any "rules, signals or system" whereby employees might be warned of the movement of cars and she asked and got an instruction (No. 4) submitting the case to the jury on that theory. Neither do we think the engineer's testimony shows engine signals were "usual." He said "at times we ring the bell and sound the whistle in making these switching movements," and gave some instances. Then he said "In

switching cars we don't ring the bell or whistle every time.'' We are unable to agree that the testimony was substantial enough to make an issue for the jury on the theory of violated custom, even if that issue had been tendered by the petition.

The respondent's other theory in avoidance of the Federal rule is that in going on or near the track the deceased did not assume the risk of an *unusually* violent and rapid switching movement. Granting but not deciding that is the law, there is no evidence in this case that the switching movement which injured the deceased was extraordinarily or excessively violent. All the witnesses for both sides who testified on the subject declared an engine speed of fifteen miles per hour was not unusual for that kind of work in cold weather. And the respondent was not wholly at the mercy of the appellant's employees whom she used as witnesses in adducing evidence on this point. She brought forward one witness, a farmer at Rolla, who had had extended switching experience. He agreed it required greater force to start cars in cold weather, and was not interrogated about the rate of speed.

Neither are we in a position to say a contrary inference was warranted by the fact that the standing car rolled 81 feet or more down the sloping track when struck by the moving car. One hypothesis advanced by the respondent was that when the deceased was run over he may have been blocking the wheel of the standing car to prevent its drifting further down the track by gravity. There is no evidence that the cars were damaged by the collision; the inference is the other way, because the testimony was that they coupled when they hit. There is no showing as to whether they were empty or loaded, or whether the brakes were set on the standing car, and none that a recoil downgrade for that distance was uncommon in that yard.

There was no substantial evidence that the deceased was dragged further than the 26 feet testified to. The estimate of the trainmen that the first car came to a stop five or six car-lengths down the track was, as we have said, highly conjectural and based wholly on their judgment that it would roll that far considering the speed of the engine. There is no hint of any marks on the ground east of where the first blood spots were found; and none that the clothing or body of the deceased indicated he had been shoved or drawn a great distance. If he was on the ground scotching the wheel or adjusting the coupler it seems the sudden and unanticipated movement of the car would have resulted in immediate injury. In short, with the statement coming from all the witnesses for both parties who spoke on that phase of the case that the switching speed was normal, we can discover nothing in the physical facts to justify a jury in saying it was not.

The respondent's real complaint is that the moving car was shunted down the track without warning. The Federal cases do not give her a cause of action on that ground.

The judgment should be and is reversed. *Lindsay* and *Seddon*, *CC.*, concur.

PER CURIAM:—The foregoing opinion by ELLISON, C., is adopted as the opinion of the court. All of the judges concur.