MARGARET ARMSTRONG, Administratrix of the Estate of WILLIAM N. ARMSTRONG, v. MOBILE & OHIO RAILROAD COMPANY, a Corporation, Appellant.—55 S. W. (2d) 460.

Division One, December 31, 1932.

*R. P. & C. B. Williams* for appellant; *Carl Fox* of counsel.

*Mark D. Eagleton* and *Allen, Moser & Marsalek* for respondent.

1230

ATWOOD, J.—This is an action under the Federal Employers' Liability Act to recover damages on account of the death of respondent's husband, William N. Armstrong, which occurred while he was employed by appellant as an engine supply man in its yard at Murphysboro, Illinois. He had just supplied ice to the cab of the defendant's standing engine number 480 when he was struck by a grab iron on the side of the tender of defendant's passing engine number 455 and rolled and crushed to death between the tender of that engine and the tender of the standing engine.

The case was tried on plaintiff's amended petition in which she alleged negligence on the part of appellant as follows:

"1. That the defendant, its officers and agents, did negligently and carelessly permit the engine that struck plaintiff's deceased husband as aforesaid to be operated upon a track that was not intended to be thus used, and said engine was permitted to come in close proximity to the place where plaintiff's husband was working all of which was in violation of the general custom or rules of the defendant.

"2. That the defendant, its said agents and servants, knew, or by the exercise of ordinary care on their part would have known, that plaintiff's deceased husband was performing duties at or near the aforesaid track, and the defendant, its officers and servants, in the exercise of ordinary care, should have warned plaintiff's deceased husband of their unusual and extraordinary use of the track aforesaid before attempting to thus use said track as aforesaid.

"3. That the defendant, its said officers and servants, saw, or by the exercise of ordinary care on their part could have seen, plaintiff's deceased husband in or approaching a position of peril of being struck by said engine in time, by the exercise of ordinary care on their part, to have stopped said engine or slackened the speed thereof or given warning of its movement and approach in proximity to plaintiff's deceased husband, but negligently and carelessly failed so to do.

"4. That the defendant, its officers and servants, knew, or by the exercise of ordinary care on their part would have known, that the space between its tracks was inadequate and insufficient, and by reason thereof engines and trains could not be operated on the aforesaid track while men were working at or near the same, with reasonable safety to those so engaged, and notwithstanding the fact that plaintiff's deceased husband was engaged in his duties in connection with an engine on the track next parallel thereto, the defendant did cause and permit an engine to be moved along the track aforesaid and to thus strike, injure and kill plaintiff's deceased husband while he was in the performance of his duties as aforesaid.

"5. That the defendant, its officers and servants, did negligently fail to give warning to plaintiff's deceased husband of their intention of coming upon the said track into close and dangerous proximity to the place where he was working, although it was usual and customary to give such warning under said circumstances.

"6. The defendant, its said officers and servants, negligently moved said engine in said yards without a sufficient or adequate crew, in that defendant should have had at least one man riding at the north end of said engine and another on the fireman's side of the cab, in addition to the men composing said crew at said time."

In its answer appellant set up a general denial, a plea that Armstrong fully knew and appreciated the danger from the approaching locomotive and assumed the risk, and a further plea that his death was due to contributory negligence, in that he knew, or by the exercise of ordinary care could have known of the approaching engine.

The reply was a general denial.

On submission of the case defendant's negligence was predicated of facts and circumstances required to be found by Instruction 1, given at the request of plaintiff, which instruction is as follows:

"The court instructs the jury that if you find and believe from the evidence that on the 9th day of June, 1927, William N. Armstrong was in the employ of the defendant, and while thus employed was preparing engine No. 480, and that said engine was then and there assigned for the use and purposes mentioned in evidence, and that while thus engaged he was injured and killed when collided with by engine No. 455 mentioned in evidence; and if you further find that at the time thereof said engine No. 455 was then and there being operated by a hostler and not by a switching crew, and that the same was being operated at the time of collision upon the track known as the cinder car track mentioned in evidence; and if you further find that it was unusual and extraordinary for said cinder car track to be thus used by an engine of the type of engine No. 455 and by a crew other than a switching crew; and if you further find that at

and prior to the time of collision aforesaid it was the defendant's custom to warn employees working in and around said cinder car track of the intention of coming in upon the same; and if you further find that at and prior to the time of collision the said William N. Armstrong was standing at or near said cinder car track and in such position that he was in peril of being struck by said engine No. 455 in the event it should be moved in and upon said cinder car track, and that the hostler and hostler's helper in charge of said engine No. 455 saw, or by the exercise of ordinary care on their part could have seen, the said William N. Armstrong in the aforesaid position of imminent peril, if you do so find, in time thereafter by the exercise of ordinary care to have stopped said engine, or given a warning of its movement and approach, and that by so doing they could thus and thereby have avoided striking and injuring said William N. Armstrong, and that the employees of the defendant in charge of said engine No. 455 did fail to stop said engine, and did fail to give a warning of its approach, and that said failure to thus warn said William N. Armstrong, if you do so find, was in violation of the custom of the defendant as aforesaid, if you do so find, and that in thus failing to so warn the said William N. Armstrong, and in failing to stop said engine, the employees of the defendant in charge of said engine No. 455 were then and there guilty of negligence, and that the said William N. Armstrong, while in the exercise of ordinary care for his own safety, if you do so find, was injured as a direct and proximate result of the aforesaid negligence on the part of said employees (if you find that the aforesaid employees were guilty of negligence in failing to stop said engine, and in failing to warn under the circumstances aforesaid, if you do so find), then your verdict will be in favor of the plaintiff and against the defendant herein, provided you find that the plaintiff prior to the time of the death of said William N. Armstrong was the lawful wife of the said William N. Armstrong, and is now the lawful widow, and that the said William N. Armstrong, deceased, died leaving surviving him the plaintiff and the three children mentioned in evidence, and that the said plaintiff was duly appointed administratrix of the estate of the said William N. Armstrong, deceased, and as such has brought this suit on behalf of herself and said children.''

Appellant insists that the court erred in overruling defendant's demurrer to the evidence interposed at the close of plaintiff's case and at the close of all the evidence in the case, because, (1) plaintiff assumed the risk as a matter of law, (2) defendant owed no duty to warn, (3) deceased's own negligence was the sole cause of his death, and (4) ''there was no substantial evidence of the alleged custom to sound the whistle on the locomotive or to ring the bell upon approach-

ing the place where the deceased was crossing the track to warrant a submission of the case.''

Defendant did not rest upon its demurrer offered at the close of plaintiff's case, but elected to offer evidence. Respondent is, therefore, entitled to the most favorable view of all the evidence in determining whether or not a case was made for the jury. [Maginnis v. Railroad, 268 Mo. 667, 187 S. W. 1165; Anderson v. Davis, 314 Mo. 515, 546, 284 S. W. 439.]

It was Armstrong's duty to furnish defendant's engines with ice, flags, tools and similar supplies needed for their respective runs, and he had been so employed for nine or ten years prior to his death. His working hours were from eleven o'clock P. M. until seven o'clock A. M. A little before six o'clock on the morning of the fatality, June 9, 1927, he was engaged in furnishing ice for the crew of engine 480 which had been set on what was known as the ''spur track'' for the purpose of being supplied. Immediately west of this track and practically parallel thereto was the ''cinder car track'' extending a little farther north to a device for loading cars with cinders. West of and practically parallel with this track was the ''lead track'' which extended still farther north to a turntable. On the west side of the lead track was a building used for a wash room, coal office and other purposes. South of this main building and close to it was the caller's shanty. Farther south the cinder car track and the spur track entered the lead track.

There were three witnesses to the accident, two of whom were offered by plaintiff and one by defendant. Witness Mayes, offered by plaintiff, testified that he had worked for defendant for about eight years and was rated as the head mechanic, that he was standing at the south end of the wash room when Armstrong placed a wheelbarrow with ice in it a few feet west of the lead track and about twelve feet south of where witness was standing. The wheelbarrow was thus west of and opposite the gangway of engine 480 which was headed south on the spur track. Armstrong took a piece of ice, weighing about fifteen pounds, from the wheelbarrow and started east toward engine 480. At this time engine 455 was backing north, tender first, along the lead track at the rate of six to twelve miles an hour but no part of it at that time had reached the cinder car track. One of defendant's witnesses testified that the measured distance from a point on the lead track opposite the gangway of engine 480 south to the switch-stand was ninety-eight feet, that the frog connecting the lead track and the cinder car track was sixty-eight feet north of the switch-stand, and that it was twenty-four feet from the place where Armstrong left his wheelbarrow to the west rail of the spur track. Mayes testified that immediately after the accident when the engines

were moved somewhat he measured and found the space was eight and five-eighths inches between the nearest parts.

Mayes further testified that Armstrong's gait was usually a little fast, and he was going toward engine 480 at about his usual gait. A hostler named Foehr, who died before the case was tried, was in charge of engine 455 and was seated at the right hand or west side of the cab. His only aid was a colored helper named Ballard. Mayes testified that he did not hear any bell rung or whistle blown on engine 455, and did not hear anyone call a warning, but when the engine got within two or three feet of Armstrong and he saw that he was going to be hit he called to him, "Look out, Bill," and gave the washout signal—the stop signal—to the hostler. He said that possibly Gilmore also called at the same time. Armstrong immediately ran up into the gangway of engine 480 and had succeeded in getting about halfway up when he was caught by the grab iron on the tank or tender of engine 455 as it was moving north, and was rolled between the two tenders and crushed to death. Of the occurrences immediately preceding, Mayes testified as follows:

"Q. What did you see Armstrong do at the time he started across the lead track? A. He walked over to engine 480, threw the ice up in the gangway, and stood there with his hands up like this, in this position, as if to ward off the ice.

"Q. When you say his hands were in this position, you mean by that his hands were elevated? A. Yes, sir.

"Q. Where, with reference to his head, were his hands elevated; give us that again? A. His hands were just above and in front of his head."

Mayes also testified without objection as follows:

"I don't believe he apparently knew 455 was coming. At least I don't think he thought it was coming on that track, and I didn't myself, and I was in the same position almost. It was coming at the time on the cinder car track, and it had been there since it got by the switch, eighty feet above there."

Mayes further testified that his duties required him to be in the roundhouse and also to inspect engines on the outside, that he had opportunity to observe the manner in which train crews came in on the cinder car track and the type of engines they brought in on this track, and that he had never before seen a Mikado type of engine, such as number 455 which was the largest type of engine used, brought in on the cinder car track. He said that only small engines and switch engines were used in this work of drawing cars loaded with cinders over this track, and that they were always handled by a switching crew of five men, consisting of an engineer, a fireman and three switchmen or a conductor and two switchmen, instead of only

a hostler and his helper as in this instance. He also testified that whenever an engine came upon the cinder car track "they came in ringing the bell, or sometimes they blew the whistle, and the switchman would give a warning to any man he saw around there by voice."

Britton Gilmore, another witness offered by plaintiff, was in defendant's employ at the time of the accident and had been employed by defendant as a machinist's helper since 1910. He was standing near Mayes and had about the same opportunity to witness what occurred. He testified that as engine 455 came up close to the cinder car track Ballard was at the rear end of the tank and on the same side as the engineer, walking about four or five feet ahead as it was backing, and then he cut across to the east or to the north and east. When the engine was within about ten feet of Armstrong he heard Ballard call, "Watch him, Bill," and Armstrong immediately "looked around and saw what was coming and then made for the deck." The witness said that when the grab iron was five or six inches away from Armstrong he (Gilmore) had his "hands in the air waiting to see if he was going to get in the clear," and then he and Ballard both gave the washout signal to the hostler about the same time. He said that Ballard was then between the cinder car track and the lead track. He also said that Armstrong was standing about twelve inches east of the cinder car track facing east when he was throwing the ice up on the deck of engine 480, that the distance between the east rail of the cinder car track and the west rail of the spur track was about three feet, and that after the grab iron caught Armstrong the engine moved four or five feet.

Gilmore also testified as follows:

"I have observed trains coming in off of the lead track prior to the accident, and onto the various tracks, and particularly the spur track and the cinder car track. I have had knowledge of that for the last 5 or 6 years.

"I had not, prior to this time, ever seen an engine of the type of No. 455 ever come in on the cinder track before. Ordinarily the smaller type of switch engine would come in on that track to pull the cinder cars out. The cinder cars that were on the cinder track when moved were ordinarily moved by a switch crew.

"Q. A switch crew is composed of how many men, the ordinary switching crew that comes in there to pull those cars? A. Five men; the engineer, fireman and three switchmen.

"Q. That is a regulation switch crew, is it? A. Yes, sir.

"Q. And at least one or more of those men stayed ahead of the engine, isn't that right? A. As a rule one of them rides the footboard; yes, sir.

"Q. And are you familiar with the custom that prevailed with

reference to moving engines in that yard as far as the men coming giving warnings to any persons working in or around the spur track or around the engines that were located close to the cinder track on which they were coming in? A. Well, I have been there when they would come in; they would see if the car was loaded and ready to go out and they always would holler and tell them they were after the cinder cars.

"Q. In hollering, would they make plenty of noise so persons standing around could hear them, or not? A. Yes, sir."

He also testified that he was right there where he could have heard any warning if it had been given, but he heard no warning of any kind except Ballard's single call to Armstrong, "Watch him, Bill."

James Ballard, the hostler's helper, was offered as a witness by defendant and testified that he threw the switch to let engine 455 in on the cinder track and then walked north on the lead track and afterwards walked to the east. The tanks of the engines were pretty close together and he was watching to see whether they would pass. The hostler and he had placed engine 480 on the spur track to permit Armstrong to supply it. He knew Armstrong would be getting on and off of it for this purpose, and that it was usual at the time of the accident to put an engine on the spur track and have it furnished with supplies at that place. He first saw Armstrong when Gilmore called. This witness then turned around and also called, "Look out, Bill," and immediately gave the stop signal to the hostler. Armstrong was then climbing up the side of engine 480 and had gotten all of his body into the cab except about two inches—if he had gotten about two inches farther he would have escaped. He said engine 455 was moving about two miles an hour when the accident occurred.

Referring to the practice to give warning in backing the engines on the cinder car track, this witness said:

"I would give a warning if I would see anyone working around the engine, the machinist or somebody, when the engines were backing on the cinder car track. . . .

"When an engine is passing another engine located on the spur track I always look around and holler to see if anybody would be coming around the corner of the engine and would run out into it. When we were backing up like in this case, and an engine is standing still, I generally would holler, because somebody might be up back of the standing engine and come around the corner and run right into the engine. . . .

"The reason I walked ahead of the engine on this occasion was to see if everything was in the clear, and a part of my duties as helper was to see that not only would the engines not sideswipe or bump each other on the spur track, but to see that the employes around there were in the clear. That was a part of my duties and instructions.

"The reason I paid particular attention to that place was that the tracks were very close together. . . .

"If a person was coming out of the cab of engine 480 on the spur track he would have only about eight or ten inches to stick his head out."

There was evidence that the narrowest engines used on the Murphysboro division were nine feet six and one-half inches in extreme width and the widest used on that division, such as engine number 455, were ten feet and one-half inch in extreme width. There was a difference in tender width of seven inches between them, or three and one-half inches each way from the center of the tender.

■ The Federal rule concerning the assumption of risk applies in this case, and under that rule not only does the servant assume the ordinary risks of the business but it "is well settled that the servant assumes extraordinary risks . . . caused by his master's negligence which are obvious or fully known and appreciated by him." [Boldt v. Railroad, 245 U. S. 441, 445; Quigley v. Hines, 291 Mo. 23, 33, 235 S. W. 1050; Southern Pac. Co. v. Berkshire, 254 U. S. 415, 418; Hoch v. Railroad Co., 287 S. W. 1047, 1051, 315 Mo. 1199; Oglesby v. Ry. Co., 1 S. W. (2d) 172, 178, 318 Mo. 79; and Osborn v. Ry. (Mo.), 1 S. W. (2d) 181, 188, wherein the cases, both Federal and State, are exhaustively reviewed.]

■ Counsel for appellant insist that the rule thus announced is applicable and decisive here. We think, however, that the evidence above outlined distinguishes this case from the numerous cases, both State and Federal, cited and relied upon by appellant. The general Federal rule is that a railroad company owes no duty to employees working in its yards to warn them of the approach of switch engines moving thereabout. [Aerkfetz v. Humphreys, 145 U. S. 418, 420; Boldt v. Pa. Railroad Co., 245 U. S. 441; Norfolk & W. Ry. Co. v. Collingsworth, 32 Fed. (2d) 561, 563, and cases cited.] But an exception to the rule is allowed when the switching movement was covered by a rule or custom to give warning for the protection of employees of the class involved and the employee was working in the line of his duty. [Jones v. Ry. Co., 30 S. W. (2d) 481, 483, 325 Mo. 1153; Martin v. Ry. Co., 30 S. W. (2d) 735, 749, 325 Mo. 1107; O'Donnell v. B. & O. Railroad Co., 26 S. W. (2d) 929, 933, 324 Mo. 1097; Koonse v. Mo. Pac. Railroad Co., 18 S. W. (2d) 467, 471, 322 Mo. 813; Chesapeake & Ohio Ry. Co. v. Mihas, 280 U. S. 102; Pacheco v. N. Y., N. H. & H. Railroad Co. (C. C. A.), 15 Fed. (2d) 467.] The custom need not be proved with such fulness as would make it a rule of the common law. [O'Donnell v. B. & O. Railroad Co., supra; Koonse v. Mo. Pac. Railroad Co., supra; St. Louis & S. F. Railroad Co. v. Jeffries (C. C. A.), 276 Fed. 73, 75.]

■ ■ There was substantial evidence in this case that it was defendant's custom to watch for and warn all employees in that part of the yard when an engine came on the cinder car track. It may also be presumed that deceased knew of this custom and relied on it, for he had been employed as an engine supply man for nine or ten years. [Director-General v. Templin (C. C. A.), 268 Fed. 483; Koonse v. Mo. Pac. Railroad Co., supra.] It is true that Armstrong was an experienced engine supply man and at the time of the accident it was daylight and the weather was clear. ■ When he started from his wheelbarrow across the track toward engine 480 he may also be presumed to have seen engine 455 with the hostler and helper moving north on the lead track. But Mayes and Gilmore both said it had not entered upon the cinder car track and Mayes said that he did not then think it was going to do so. There was evidence that it was an unusual and extraordinary use of the cinder car track to run engines as wide as 455 over it, and that such use was an extra hazard because of the narrow clearance with an engine standing on the spur track. So, it was by no means open and obvious that engine 455 was even coming in on the cinder car track. Unless Armstrong saw the switch thrown, and there is no evidence to that effect, he or any prudent person under the same circumstances might well conclude that this engine would not go on the cinder car track but would continue on the lead track at the north end of which was the turntable, or if brought on the cinder car track those in charge of the engine would watch for and warn all employees working in that vicinity of the approaching engine in accordance with defendant's custom shown to be of long standing. The evidence most favorable to plaintiff that must now be considered in ruling defendant's demurrer to the evidence is substantially more than the "scintilla of proof" condemned in Norfolk & W. Ry. Co. v. Collingsworth, 32 Fed. (2d) 561, 564; Small Co. v. Lamborn & Co., 267 U. S. 248, 254, and similar cases relied upon by appellant, and made it a question for the jury whether the danger attending the position in which Armstrong placed himself was an ordinary risk or an extraordinary risk that was open and obvious or fully known and appreciated by him. Under all the evidence above indicated we can not say as a matter of law that Armstrong assumed the risk, or that there was no custom or duty to warn, or that his act was the sole cause of his death.

■ Counsel for appellant also say that above quoted instruction number 1 is fatally erroneous in submitting as a ground of liability that "engine 455 was then and there being operated by a hostler and not by a switching crew;" that there are no facts pleaded showing that deceased, by virtue of any custom or rule, had a right to rely upon the protection of a switching crew of five men.

1240

Paragraph 6 of the above quoted excerpt from plaintiff's petition charging negligence on the part of defendant plainly alleged that "defendant, its said officers and servants, negligently moved said engine in said yards without a sufficient or adequate crew, in that defendant should have had at least one man riding at the north end of said engine and another on the fireman's side of the cab, in addition to the men composing said crew at said time." There was evidence that a switching crew consisted of an engineer on the right side, a fireman on the left side, and three switchmen, or a conductor and two switchmen, one of the switchmen usually riding the footboard. It was an undisputed fact that the engine that struck Armstrong was manned by only a hostler and his helper and not by a regular switching crew. Surely it was not beyond the pleadings and proof to set forth this fact as a circumstance to be found with other facts necessary to constitute negligence. The instruction makes no reference to a custom or rule requiring the use of "a switching crew of five men."

■ This instruction is also said to be reversibly erroneous in directing a finding that it was "unusual and extraordinary for said cinder car track to be thus used by an engine of the type of engine 455."

Paragraph 1 of the above quoted pleading charged that the engine that struck Armstrong was negligently "operated upon a track that was not intended to be thus used. . . . in violation of the general custom or rules of the defendant," and there was substantial proof of defendant's custom to use this track only for engines smaller and not as wide as number 455. Paragraph 2 of the same pleading refers to the use complained of as an "unusual and extraordinary use of the track." There was undisputed evidence that engines of the type of 455 were wider by three and one-half inches on each side than those customarily operated on the cinder car track, and that if the clearance of engines 455 and 480 had been just two inches more Armstrong would have escaped. Certainly, under the evidence, this unusual and extraordinary use of the track was an extraordinary risk arising out of facts pleaded and proved, and proper to be submitted along with other facts and circumstances submitted as constituting negligence. The instruction is not in this respect broader than the pleadings and proof.

■ It is further claimed that this instruction is fatally erroneous in submitting the theory that the engineer saw the deceased in a position of imminent peril, and in putting the duty upon the operatives of engine 455 to exercise ordinary care to discover the deceased in a position of peril.

The above criticisms are directed to the part of this instruction

telling the jury that "if you further find that at and prior to the time of collision the said William N. Armstrong was standing at or near said cinder car track and in such position that he was in peril of being struck by said engine No. 455 in the event it should be moved in and upon said cinder car track, and that the hostler and hostler's helper in charge of said engine No. 455 saw, or by the exercise of ordinary care on their part could have seen, the said William N. Armstrong in the aforesaid position of imminent peril, if you do so find, in time thereafter by the exercise of ordinary care to have stopped said engine, or given a warning of its movement and approach, and that by so doing they could thus and thereby have avoided striking and injuring said William N. Armstrong, and that the employees of the defendant in charge of said engine No. 455, did fail to stop said engine, and did fail to give a warning of its approach, and that said failure to thus warn said William N. Armstrong, if you do so find, was in violation of the custom of the defendant as aforesaid, if you do so find, and that in thus failing to so warn the said William N. Armstrong, and in failing to stop said engine, the employees of the defendant in charge of said engine No. 455 were then and there guilty of negligence," etc.

There was substantial evidence of a general duty resting upon appellant's employees in charge of engines on the cinder car track both to keep a watch and to sound a warning for the benefit of any employees who might be working at the place where respondent's husband was working, arising out of a custom to watch and warn because of the danger that a man who was not seen might step into peril due to the narrow clearance between the engines. The custom was shown to have been of such long standing that Armstrong may be presumed to have had knowledge of it and relied on it. If appellant's servants failed to perform this duty and respondent's husband was injured and killed as a result, appellant is liable. Engine 455 entered upon the cinder car track about thirty feet south of engine 480. The hostler's helper said it was travelling about two miles an hour and was stopped within four or five feet when he finally gave the stop signal. It was daylight and the weather was clear. Armstrong started across the tracks while engine 455 was still on the lead track. The hostler's helper was walking a few feet north of engine 455 and Armstrong was in plain view all the while apparently intent upon placing the ice on engine 480 and seemingly oblivious of the approach of engine 455. There was the duty upon the hostler and his helper to look and to warn, and under the circumstances in evidence to look was to see. [Rine v. Railroad, 100 Mo. 228, 235, 12 S. W. 640; Dutcher v. Railroad, 241 Mo. 137, 149, 150, 145 S. W. 63; Kame v. Railroad, 254 Mo. 175, 196, 162 S. W.

240.] The facts here in evidence distinguish this feature of the case from the cases cited and relied on by appellant.

 It is also urged that the court "erred in admitting evidence that the defendant failed to furnish a regular switching crew, composed of five men instead of a hostler and his helper. There is no pleading of a custom or practice to switch with a full crew for the protection of the deceased." It is true no such custom was pleaded, but none was relied upon as a ground of recovery. The petition charged negligence in failing to warn the deceased, and a custom to warn employees under the circumstances shown was both pleaded and proved. We have already quoted allegations of the petition as to insufficiency of the engine crew, but independent of this pleading the testimony here objected to would have been competent as proof of evidentiary facts bearing upon the pleaded negligence of failure to warn. [Timmermann v. Iron Co., 1 S. W. (2d) 791, 797, 318 Mo. 421; Hogan v. Fleming et al., 297 S. W. 404, 408, 317 Mo. 524; Kinney v. St. Ry. Co., 261 Mo. 97, 113, 169 S. W. 23.]

 Counsel for appellant finally urge that the judgment of $18,000 is excessive. The evidence showed that deceased was forty-eight years of age and at the time of his death had a life expectancy of 22.36 years. He turned all his earnings over to his wife for the support of herself and their children, taking care of himself by income from other odd jobs. One of his daughters is an epileptic and it is fair to assume that this child was and would likely continue to be dependent upon her father to a considerable extent for her support. We do not think that the amount of the judgment should be disturbed.

No reversible error appearing in the record the judgment is affirmed. All concur.