CHARLES L. GRANGE v. CHICAGO & EASTERN ILLINOIS RAILWAY COMPANY, Appellant.—69 S. W. (2d) 955.

Division One, March 14, 1934.

*Jones, Hocker, Sullivan & Gladney, William O. Reeder* and *Vincent L. Boisaubin* for appellant.

1042

*Eagleton, Henwood & Waechter* for respondent.

STURGIS, C.—By this appeal the defendant challenges the correctness of a judgment against it in a personal injury action for damages, brought and tried in the Circuit Court of the City of St. Louis, under the Federal Employers' Liability Act. Plaintiff, an employee of defendant in interstate commerce, was injured at Livingston, Illinois, through which defendant was operating an interstate freight train, by having his hand crushed under the wheel of one of the freight cars. His work was that of an inspector and repairer of cars

and equipment used by defendant and, on the occasion in question, while attempting in the course of his work to pass between the ends of two freight cars in a long train in going from one side of the train to the other, he fell or was thrown down with his hand on one of the rails, where it was crushed by the car wheel passing over it.

The freight train in question, a through one consisting of sixty-eight cars, was going east and some five or six miles before reaching Livingston, where it would not usually stop, it was discovered that there was a "hot box" at one of the cars and this made it necessary to stop there. There was also a water tank at Livingston and the engineer and fireman decided to take advantage of the stop to fill the tender with water while taking care of the hot box. It was part of plaintiff's duties to help take care of hot boxes and he stayed at what is called a shanty, where his tools and supplies were kept, located on the south side of the main track about thirty feet from the track and one hundred fifty feet west of the water tank. It was plaintiff's duty to be there and be ready to assist in taking care of hot boxes or any repairs needed in case the train stopped for that or any purpose. If the train stopped going east so as to take water at the tank, plaintiff's shanty would be about opposite the coupling of the third and fourth cars west of the engine. This is the place where plaintiff attempted to go through the train from the south to the north side when the train stopped on this occasion, and he received his injury by falling with his hand under the north front wheel of the fourth car.

According to plaintiff's evidence, it was early in the morning but broad daylight when this train approached Livingston, slowing down to stop at the water tank, and plaintiff says he was standing about half way between his shanty and the main track on which the train approached ready to do any needed work. As the engine of the train passed plaintiff going slow, the head brakeman standing in the cab of the engine gave him the hot box signal, which consisted of putting his hand to his nose and pointing toward the hot box—on this occasion indicating that the hot box was on the north side of the train toward the rear or west end. Plaintiff says he understood this signal fully in that he was to help look after this hot box and so he at once went into his shanty to get some additional tools and material to use in this work, and when he came out and was some ten feet from the train it had stopped and the fireman was upon the tender. Plaintiff testified that he then gave the stop signal to the engineer and fireman, which meant that the train was not to move while he went through the train to the other side. The conductor testified that when a train was stopped and a person wanted it to stand still for any reason, he would give the stop signal. The plaintiff says that the fireman answered this signal with the same signal, which meant that the train was not to move, and on this assurance he attempted to go

through the train to the other side, and while he was climbing over the coupling between the third and fourth cars the engineer, without any signal or warning whatever, suddenly and with a jerk moved the train forward about three feet, throwing him to the ground with his hand on the north rail, so that the front wheel on that side crushed his left hand so that it had to be later amputated.

The assignments of negligence in the petition are (1) that defendant and its servants operating the engine and train negligently moved the cars while plaintiff was between the same and (2) negligently failed to warn plaintiff of such movement, (3) negligently assured plaintiff that said cars would not be moved as aforesaid, and (4) negligently failed to use ordinary care to discover that plaintiff was in the act of going between said cars, though by using such care it could and would have known of such act. We might here say that the acts of negligence (1) and (2) really constitute but one ground of negligence, to-wit, that defendant negligently moved the cars while plaintiff was going between same without giving any warning of its intention to do so, and the instructions given to the jury so combine the acts of negligence in this respect. Also the ground of negligence (3) was ignored or lost sight of in the instructions as a distinct ground of negligence. So far as plaintiff's single instruction to the jury specified defendant's negligence as warranting a finding for plaintiff on the first three specifications mentioned, it merely told the jury that if defendant's train was brought to a complete stop for the purpose of having work done on one of its cars, and that plaintiff went between the cars for that purpose in the line of his duty and was injured, and "if you further find that thereafter, while the plaintiff was in between the ends of said cars, the said train was moved without warning to the plaintiff, if you so find, and that in thus moving said train, if you do so find, the defendant, through its employees, was guilty of negligence, and that the plaintiff was injured as a direct result of the aforesaid negligent acts on the part of defendant, through its agents, if you find defendant, through said employees, was guilty of the aforesaid acts of negligence, then your verdict will be in favor of the plaintiff and against the defendant." The fourth ground of negligence specified in the petition was also embodied in plaintiff's instruction and we will discuss this later.

As touching on the ground of negligence in moving the cars after the train came to a complete stop with the engine at the water tank, we will say that it is conceded that it was plaintiff's duty to promptly respond to the head brakeman's signal that a hot box toward the rear of the train needed his attention. Nor is it disputed, or at least such is plaintiff's positive evidence, that the brakeman indicated to plaintiff that the hot box was on the north side of the train, necessitating his crossing over through the train, and as he did not know how far back in the train the hot box was located, it was natural for

plaintiff to cross over at once. We also note that the head brakeman testified that as the train approached its place of stopping, he first saw plaintiff standing on the north side of the track opposite his shanty and gave him the hot box signal while there and considerably before the engine passed his shanty, and that plaintiff then crossed the track to the south side ahead of the engine going toward his shanty for his tools, and that he (brakeman) got off the engine on the north side considerably before reaching the shanty and proceeded back on the north side towards the hot box. This, however, is a mere contradiction of plaintiff's evidence on points not vital to the case, as in any event it places plaintiff on the south side of the train when it stopped after receiving the signal and information that the hot box was on the north side toward the rear of the train. It developed later that the hot box was in fact on the south side of the train at the fortieth car back from the engine, and that the head brakeman, who went back from the engine, and the conductor, who came forward from the caboose, both on the north side, met there and crossed through the train to the hot box. The conductor gave his explanation of this that the north was the windward side of the train and that hot boxes were best located by the smell.

The plaintiff was injured at the place and in the manner detailed by him is corroborated by the physical facts in that both the conductor of the train and the head brakeman examined, separately, the third and fourth cars from the engine shortly after the accident and found blood on the flange of the left or north front wheel on the fourth freight car from the engine. This affords strong evidence not only that plaintiff fell and was injured between the third and fourth cars back from the engine, but that the cars were moved or moving forward at the time. We note this for the reason that the fireman testified that when the train came to a stop it had gone a foot or two too far east to connect the water spout with the hole in the tender and that it was necessary to back up in order to make the connection. He testified, however, that the engine and cars neither backed up or went forward after it came to a stop, but was stretched out without any slack between the cars and did not move backward or forward till some little time after the accident. In this the fireman is corroborated by the conductor and brakeman. The engineer died before the case was tried and we do not have his version of the matter. The fireman testified that when he got ready to adjust the water spout to the hole in the tender and signaled the engineer to back up, the engineer had left the engine and was on his way up town for tobacco or something and the engine did not move backward or forward till he (the fireman) moved it some time later. No one actually saw the plaintiff receive his injury and he says that he extricated himself from his peril under the car and climbed back over the coupling to the south side of the train and that a friend then helped him to a local

doctor's office, and he was sent later to defendant's hospital where his hand was amputated above the wrist. If the evidence of the train crew is correct as to the train not moving either forward or backward just after it came to a stop, the only conclusion is that plaintiff did not wait till the train stopped, but attempted to go through the train while yet in motion and fell to his injury. If true, that would be his own negligence and he could not recover. The fireman positively denied that the plaintiff gave him any stop signal or that he answered any such signal either before or after the train stopped.

It is argued with much force by defendant that even if the plaintiff did give the fireman, who was upon the tender trying to adjust and connect the water spout with the hole in the tender, the stop or hold signal, the fireman was not in control of the engine and the engineer could not and did not know of his intention to cross between the cars. We do not think, however, that actual knowledge of that fact on the part of the engineer was necessary to make his act in moving the engine forward after it once came to a stop a negligent act. The case did not proceed on that theory but on the theory that after coming to a full stop, it was negligence on defendant's part to move the cars without giving a warning signal unless the engineer knew that no one was likely to be in the act of being under or between the cars in the course of his work.

The defendant cites and relies on a class of cases applicable to operating engines and moving cars in switch yards where the rule applies that the employees working there must look out for their own safety and themselves guard against the dangers arising from moving engines and cars in switching operations rather than depend on the engineers and train operators to do this for them. The rule in such cases is that engineers and switching crews only owe the duty not to injure persons they know to be in danger, but not to watch out for or warn other employees unless they know of their presence and danger. [Martin v. Wabash Railroad Co., 325 Mo. 1107, 30 S. W. (2d) 735, and cases there cited; C. & O. Ry. Co. v. Mihas, 280 U. S. 102; Toledo, St. Louis & Western Railroad Co. v. Allen, 276 U. S. 165, 72 L. Ed. 513; Armstrong v. Mobile & O. Ry. Co., 331 Mo. 1224, 55 S. W. (2d) 460; Jones v. St. Louis-San Francisco Ry. Co., 325 Mo. 1153, 30 S. W. (2d) 481.] In cases based on the Federal Employers' Liability Act, this court follows the ruling of the Federal courts in like cases, which is stated in the Martin case, supra, thus: "The Federal courts seemingly adhere to and apply the principle of the common law that yard employees, regardless of their class and the character of their work, and regardless of their precise and particular duties, must themselves look out for their own safety, and that switching or engine crews are under no duty or obligation, while engaged in yard movements, to watch out for the safety of yard employees, or to warn them, unless actually seen to be in im-

mediate peril and oblivious thereof.'' This class of cases, we think, has no application to the facts and situation here disclosed. This was in no sense a switching operation or movement of an engine or cars in a switch yard. It was an operation and movement of the engine and cars of a through train on the main single line of travel and had nothing to do with switching movements, much less with movements in switch yards. A reading of the cases cited and others of like kind shows that the underlying reasons for not imposing on those engaged in switch yard work a duty to watch out for and warn other employees engaged in the same work, leaving them to look out for their own safety, do not apply to situations and train movements like that in question. Here the train was brought to a stop for the sole purpose of having work done on one of the cars in the train, and the engineer and fireman in charge of the engine knew that work of that character was to be done by plaintiff in connection with the train crew. There is nothing to show that either the engineer or fireman knew which car of the train had the hot box to be fixed or on which side of the train it was located. They certainly did not know that plaintiff would not in the course of his work be required to pass through the train between the ends of the cars, a movement obviously dangerous in case the train should be moved while plaintiff was between the cars. The danger of so doing could easily be obviated by sounding the whistle in case it was necessary for any purpose to move the train in that situation. The jury could well find that it was negligence not to do so. Both this court and the Federal courts have been careful to distinguish and not to extend the rule of non-liability, arising from necessity, for failure to look out for and warn employees of dangers arising and incident to switching operations in switch yards, to cases which reasonably require the members of a train crew to observe the rules of care dictated by ordinary prudence with no necessity for doing otherwise. [Martin v. Wabash Railroad Co., 325 Mo. 1107, 30 S. W. (2d) 735; 745; Kamer v. Missouri-Kansas-Texas Railroad Co., 326 Mo. 792, 32 S. W. (2d) 1075, 1083; Illinois Central Railroad Co. v. Norris, 245 Fed. 926, 929.] In addition to the physical facts themselves warranting a finding of negligence, the conductor of this train testified that when a train was stopped for a purpose and in a situation like the one shown here, it was not supposed to move without giving a warning signal of the whistle, at least not so unless moving on a signal of some member of the train crew to do so. As we understand the conductor's evidence, it is to the effect that when a train comes to a complete stop for a purpose like this one did, making it likely that some employee may go through the train, it should not move without a warning signal being given unless some member of the crew signals the engineer to do so, in which case the engineer may or may not give the warning signal of his intention to move the train. ■ As applied to the situation here, when the

engineer came to a full stop, he should not move the train again without giving a warning signal to those working or who might be working about the train, unless the fireman, whose duty it was to adjust the water spout to the hole in the tender, found that such adjustment could not be made without the engine being moved forward or backed up and gave the engineer a signal to do so. No one except the fireman would have any reason to do this, and to prevent the fireman from so doing while plaintiff was going through the train, he might properly have given the fireman the stop signal in order to prevent his signaling the engineer to go forward or back up as might be required. As plaintiff's stop signal would only be for the purpose of preventing the fireman from signaling the engineer to move the engine and cars, it matters not that the engineer did not or could not observe such signal.

█ The non-liability doctrine for failure to watch for and warn employees working in switch yards is largely based on the doctrine of assumed risk. As it is found to be wholly impractical, if not impossible, considering the nature of the work carried on in switch yards, to require engineers and switch crews to keep a vigilant watch and warn other employees in the yards of the dangers arising from switching operations, such dangers are classed with and as part of the dangers ordinarily incident to that class of work and are therefore among the ordinary dangers incident to that class of work, the risk of which is assumed by those engaged therein. What we have said, therefore, about this accident not arising from or in switch yard work or being incident thereto disposes of the contention that plaintiff should be held to have assumed the risk. The rule of assumed risk which the Federal courts apply to cases arising under the Federal Employers' Liability Act is that the employee, by virtue of his employment, assumes all the risk and dangers ordinarily incident to his employment, and also those risks due to the employer's negligence, which are obvious or fully known to the employee and the dangers and risk thereof fully appreciated by the employee or which are so obvious and plainly observable that the employee must be presumed to have known of and assumed the same. [Boldt v. Pennsylvania Railroad Co., 245 U. S. 441, 445, 62 L. Ed. 385; Toledo, St. Louis & Western Railroad Co. v. Allen, 276 U. S. 165, 169, 72 L. Ed. 513; McIntyre v. St. Louis-San Francisco Ry. Co., 286 Mo. 234, 256, 227 S. W. 1047; Martin v. Wabash Railroad Co., 325 Mo. 1107, 30 S. W. (2d) 735, 742.] We do not believe that the act of the engineer, found by the jury to have been negligent, in moving the train forward with a jerk and without giving any warning signal of his intention to do so after it had come to a full stop for the purpose of having the plaintiff, in connection with the train crew, do repair work to remedy the hot box, can properly be said to be one of the ordinary dangers incident to and inherent in the doing of his work, and certainly it was not an

1050

extraordinary risk and danger caused by defendant's negligence which plaintiff assumed because he knew of same beforehand and fully appreciated the danger he was about to incur.

The plaintiff's fourth specification of negligence in his petition was embodied in the first part of his only instruction to the jury to the effect that if the jury found that defendant, "through its employees in charge of said train, in the exercise of ordinary care on its part, could have seen plaintiff going between the ends of said cars, and if you further find that the defendant, through its said employees, did fail to discover the plaintiff going between the ends of said cars, as aforesaid, and that in thus failing, if you do so find, the defendant, through its said employees, was then and there guilty of negligence," then to find for the plaintiff. It is apparent that this part of the instruction implies a duty on the part of the engineer to use reasonable vigilance and watchfulness under the circumstances in discovering that plaintiff was going between the ends of the cars, and that a failure to use such vigilance would constitute negligence. This, the defendant claims, is erroneous and also inconsistent with the proposition of law following it in the same instruction declaring it negligence for the engineer to move the cars while plaintiff was likely to be going through the train between the ends of such cars. Granting that this is true, it merely means that under our view of the case, the plaintiff merely placed on himself an unnecessary burden of proving active rather than passive negligence on the part of the engineer. The engineer's duty to sound the warning whistle on moving the train arose, not from his lack of vigilance in observing what plaintiff was doing, but from his not doing so when he did not know. These two propositions, however, were connected by the conjunction "and" so that the jury was required to find the affirmative of both when one was sufficient.

It is insisted by defendant that its liability depends on proof that the engineer did in fact move the cars in question after the train came to a full stop and that the proof of this fact rests solely on plaintiff's own evidence, contradicted by every other witness in the case. All the members of the train crew except the engineer, who was dead at the time of the trial, testified positively that the train did not move after it came to a full stop till some time after the accident, and, according to their evidence, the plaintiff must have attempted to go through the train to the north side before it came to a stop. If this be true, plaintiff cannot recover. Plaintiff was also confronted with his signed statement made three days after the injury, procured, however, by defendant's claim agent but witnessed by a disinterested party, in which he made no mention of giving the stop signal to the fireman or engineer just as he started through the train, and further stated that he could not see the engineer at the time and did not think that the fireman saw that he was intending

to go through the train. Plaintiff, however, testified that he was taking opiates the day he made this statement; that he did not read it over, and he denied that he told the claim agent that he gave no signals to the engineer or fireman before going between the cars. This disputed question was squarely put up to the jury in requiring by plaintiff's instruction that the jury must find that "said train was brought to a full and complete stop, and that thereafter, and while said cars were motionless, plaintiff went between the ends of said cars," and the jury was also told by defendant's Instruction No. 2 that before plaintiff could recover he must prove "that the cars were stopped and standing when he attempted to pass between the cars." The argument is made that the evidence against plaintiff's version of the occurrence is so overwhelming and such version is so contrary to the believable evidence that this court should conform its rulings to that of the Federal courts in refusing to permit verdicts to stand which are unsupported by the evidence as a whole. Defendant in its brief says: "The time is ripe for the state courts to exercise a superintending control over verdicts in Federal Employers' Liability cases. . . . The rights and remedies of the parties in actions under the Federal Employers' Liability Act, and the sufficiency of the evidence to sustain verdicts, are to be determined by the Federal decisions. Under the rule announced by the Supreme Court the entire record will be examined with a view of determining whether, as a matter of law, there is sufficient evidence to sustain a finding of negligence. . . . The policy of allowing the plaintiff every possible advantage and of giving him every possible benefit under the testimony, even to the point of assuming that plaintiff is wholly right and that all of the other witnesses are wholly wrong is, in our opinion, not in consonance with the Federal Law upon the subject, and should have its limit." In support of this defendant cites Chicago, Mil. & St. P. Ry. Co. v. Coogan, 271 U. S. 472, 474; Southern Ry. Co. v. Verelle, 57 Fed. (2d) 1008, 1010, and Pennsylvania Railroad Co. v. Chamberlain, 77 L. Ed. 819. In the Coogan case, supra, the United States Supreme Court said: "The employer is liable for injury or death resulting in whole or in part from the negligence specified in the act; and proof of such negligence is essential to recovery. The kind or amount of evidence required to establish it is not subject to the control of the several states. This court will examine the record, and if it is found that as a matter of law, the evidence is not sufficient to sustain a finding that the carrier's negligence was a cause of the death, judgment against the carrier will be reversed. (Cases cited.)" In the Verelle case, supra, the Circuit Court of Appeals said: "We think, however, after a careful examination of the record, that the evidence of neglect was too slight to warrant this action, and that a verdict for the defendant should have been directed. While it cannot be said that there was

absolutely no evidence of neglect on the fireman's part, it seems to us quite insufficient to support the verdict. It was said by the Supreme Court in Small Co. v. Lamborn & Co., 267 U. S. 248, 254, 69 L. Ed. 597: 'The rule for testing the direction of a verdict, as often has been held, is that where the evidence is undisputed, or of such conclusive character that if a verdict were returned for one party, whether plaintiff or defendant, it would have to be set aside in the exercise of a sound judicial discretion, a verdict may or should be directed for the other party. The view that a scintilla or modicum of conflicting evidence, irrespective of the character and measure of that to which it is opposed, necessarily requires a submission to the jury has met with express disapproval in this jurisdiction, as in many others.' '' And in the Chamberlain case, supra, the United States Supreme Court said: ''The rule is settled for the Federal courts, and for many of the state courts, that whenever in the trial of a civil case the evidence is clearly such that if a verdict were rendered for one of the parties the other would be entitled to a new trial, it is the duty of the judge to direct the jury to find according to the views of the court. Such a practice, this court has said, not only saves time and expense, but 'gives scientific certainty to the law in its application to the facts and promotes the ends of justice.' ''

We find nothing in these cases materially different from the pronouncements of the law as made and applied by this court. We have often ruled that it requires substantial evidence, rather than a mere scintilla of evidence, to support a verdict; that a verdict cannot rest on evidence contrary to the physical facts or inherently unbelievable or demonstrated to be false. We have always recognized that the question whether there is substantial evidence warranting a finding for plaintiff is one of law for the court—the trial court in the first instance and this court on appeal. But we also hold that when the evidence is conflicting and substantial on both sides, the weight of the evidence and the credibility of the witnesses is solely for the jury, with the right of the trial court to grant a new trial if and when it concludes that the verdict of the jury is against the weight of the evidence. When the trial court submits the case to the jury and it has returned a verdict, which the trial court refuses to set aside as being against the weight of the evidence, this court will not, in the absence of reversible error committed in the course of the trial, reverse the case unless it appears that there is no substantial evidence supporting the verdict, which is much the same thing as that the verdict is against all the credible and unbelievable evidence. We do not believe that this court entertains views which are in conflict with the high Federal courts on this subject.

Other errors urged by defendant have been considered, but what we have said disposes of those which we think are material.

■ On a careful review of all the evidence in this case, we think

that the evidence, practically all of it introduced by plaintiff, presented a proper case for the jury, and, the case having been tried without reversible error, the judgment should be affirmed unless, as defendant insists, the verdict is excessive. The original verdict was for $20,000, which the trial court thought so excessive that it required the plaintiff to enter a *remittitur* for $3000 and the judgment is for $17,000. The question is now presented whether the trial court required a *remittitur* large enough to correct the excessive verdict. We have concluded that there should be required a furthr *remittitur* of at least $7000. At the time of his injury plaintiff was fifty years old and was earning about $165 per month. He lost his left hand at the wrist. His hospital bills and medical and surgical expenses were taken care of by the hospital maintained for that purpose and no claim is made for such items. Plaintiff has suffered just such injury and damage as necessarily resulted from the crushing of his hand and the amputation at the wrist. The hospital surgeon who attended him said he had no injuries other than to his hand, which necessitated the amputation just above the wrist; that he got good results and a very satisfactory stump. The doctor called by plaintiff, who examined him for the purpose of testifying, said that he found the stump smooth and free and a good scar. The plaintiff had suffered a previous injury resulting in a fracture of his left collar bone and shoulder blade, which had been treated by the same hospital surgeon. The plaintiff claimed to be suffering some pains in and impairment of his shoulder, but the evidence does not show a resultant connection of this shoulder injury with the accident here sued for. If we follow such precedents as Rose v. Railroad, 315 Mo. 1181, 289 S. W. 913; Wolfe v. Payne, 294 Mo. 170, 241 S. W. 915; Leighton v. Davis (Mo.), 260 S. W. 986, and Cole v. Railroad, 332 Mo. 999, 61 S. W. (2d) 344, a verdict above $10,000 would be excessive.

If, therefore, the plaintiff will within ten days enter in this court a further *remittitur* of $7000, a judgment will be entered for plaintiff for $10,000 as of the date of the judgment appealed from; otherwise, the case will be reversed and remanded. *Ferguson* and *Hyde, CC.,* concur.

PER CURIAM:—The foregoing opinion by Sturgis, C., is adopted as the opinion of the court. All the judges concur, except *Hays, J.,* absent.